ORIGINAL

Approved: _____
NOAH SOLOWIEJCZYK/EDWARD B. DISKANT/ROBERT BOONE/
RUSSELL CAPONE
Assistant United States Attorneys

Before:   THE HONORABLE JAMES L. COTT
United States Magistrate Judge
Southern District of New York    **17 MAG    7119**

- - - - - - - - - - - - - - - - x
                                :
UNITED STATES OF AMERICA        :      **SEALED COMPLAINT**
                                :
      - v. -                    :      Violations of
                                :      18 U.S.C. §§ 371, 666,
LAMONT EVANS,                   :      1343, 1346, 1349,
EMANUEL RICHARDSON,             :      and 2
      a/k/a "Book,"             :
ANTHONY BLAND,                  :
      a/k/a Tony,"              :
CHRISTIAN DAWKINS, and          :
MUNISH SOOD,                    :      COUNTY OF OFFENSE:
                                :      NEW YORK
                  Defendants.   :
- - - - - - - - - - - - - - - - x

SOUTHERN DISTRICT OF NEW YORK, ss.:

     JOHN VOURDERIS, being duly sworn, deposes and says that he
is a Special Agent with the Federal Bureau of Investigation
("FBI"), and charges as follows:

**COUNT ONE**

(Conspiracy to Commit Bribery)

     1.    From at least in or about 2016, up to and including in
or about September 2017, in the Southern District of New York
and elsewhere, LAMONT EVANS, EMANUEL RICHARDSON, a/k/a "Book,"
ANTHONY BLAND, a/k/a "Tony," CHRISTIAN DAWKINS, and MUNISH SOOD,
the defendants, and others known and unknown, willfully and
knowingly did combine, conspire, confederate, and agree together
and with each other to commit offenses against the United
States, to wit, violations of Title 18, United States Code,
Sections 666(a)(1)(B) and 666(a)(2).

2.    It was a part and object of the conspiracy that LAMONT EVANS, EMANUEL RICHARDSON, a/k/a "Book," and ANTHONY BLAND, a/k/a "Tony," the defendants, being agents of organizations that received, in a one-year period, benefits in excess of $10,000 under a Federal program involving a grant, contract, subsidy, loan, guarantee, insurance, and other form of Federal assistance, to wit, University-2, University-3, University-4, and University-5,[1] corruptly would and did solicit and demand for the benefit of a person, and accept and agree to accept, something of value from, among others, CHRISTIAN DAWKINS and MUNISH SOOD, the defendants, and a cooperating witness for the Government ("CW-1") and undercover law enforcement officers, intending to be influenced and rewarded in connection with a business, transaction, and series of transactions of such organizations, involving something of value of $5,000 and more, in violation of Title 18, United States Code, Section 666(a)(1)(B).

3.    It was further a part and an object of the conspiracy that CHRISTIAN DAWKINS and MUNISH SOOD, the defendants, and others known and unknown, corruptly would and did give, offer, and agree to give something of value to a  person, with intent to

---

[1] In addition to the bribery and fraud scheme described herein, the investigation has revealed additional instances of bribe payments to coaches at NCAA Division I universities, as well as a related scheme involving significant cash payments by athlete advisors, and executives of at least one athletic apparel company, to the families of high-school student-athletes, at the request of basketball coaches at two NCAA Division I universities, in exchange for agreements by those athletes to attend the universities and later to sign with the advisors and apparel company who made the bribes.  These additional schemes are detailed in two related Complaints also unsealed today.  *See United States* v. *Chuck Connors Person, et al.*, 17 Mag. ____, and *United States* v. *James Gatto, et al.*, 17 Mag. ____.  For ease of reference in reading and understanding the three related Complaints, together all universities and players referenced in this Complaint and the two related Complaints have been numbered sequentially, without duplicating defined terms, beginning with University-1 and Player-1 in *United States* v. *Chuck Connors Person, et al.*

influence and reward an agent of an organization, in connection with business, transactions, and series of transactions of such organization involving a thing of value of $5,000 and more, while such organization was in receipt of, in any one year period, benefits in excess of $10,000 under a Federal program involving a grant, contract, subsidy, loan, guarantee, insurance, and other form of Federal assistance, in violation of Title 18, United States Code, Section 666(a)(2).

<u>OVERT ACTS</u>

4.    In furtherance of the conspiracy and to effect the illegal objects thereof, the following overt acts, among others, were committed in the Southern District of New York and elsewhere:

a.    On or about March 3, 2016, in South Carolina, LAMONT EVANS, CHRISTIAN DAWKINS, MUNISH SOOD, the defendants, and CW-1 met, during which meeting EVANS, DAWKINS, SOOD and CW-1 discussed, in sum and substance and in part, that EVANS could direct and influence certain student-athletes that EVANS coached at University-2 to retain the services of DAWKINS, SOOD and CW-1.

b.    On or about April 19, 2016, EVANS met with CW-1 and SOOD in Manhattan, New York, during which meeting CW-1 provided EVANS with a cash bribe of $500.

c.    On or about February 3, 2017, EVANS met with CW-1 in West Virginia, during which meeting CW-1 provided EVANS with a cash bribe of $2,000 and EVANS introduced CW-1 to a basketball player at University-3.

d.    On or about June 20, 2017, SOOD, EMANUEL RICHARDSON, a/k/a "Book," the defendant, CW-1, and an undercover FBI agent ("UC-1"), among others, met in Manhattan, New York, during which meeting RICHARDSON received a cash bribe of $5,000.

e.    On or about July 20, 2017, SOOD, RICHARDSON, and UC-1 met in New Jersey, during which meeting RICHARDSON received a cash bribe of $15,000.

f.   On or about July 29, 2017, DAWKINS, ANTHONY
BLAND, a/k/a "Tony," the defendant, CW-1, and UC-1, among
others, met in a hotel room in Las Vegas, Nevada.  During the
meeting, DAWKINS confirmed, in the presence of BLAND, that the
undercover FBI agent had $13,000 with him intended for BLAND.
Thereafter, DAWKINS took an envelope containing $13,000 from the
undercover FBI agent and left the hotel room with BLAND.

(Title 18, United States Code, Section 371.)

## COUNT TWO

(Solicitation Of Bribes and Gratuities By An Agent Of A
Federally Funded Organization – LAMONT EVANS)

5.   From at least in or about 2016, up to and including in
or about September 2017, in the Southern District of New York
and elsewhere, LAMONT EVANS, the defendant, being an agent of an
organization that received, in a one-year period, benefits in
excess of $10,000 under a Federal program involving a grant,
contract, subsidy, loan, guarantee, insurance, and other form of
Federal assistance, to wit, University-2 and University-3,
corruptly solicited and demanded for the benefit of a person,
and accepted and agreed to accept, a thing of value from a
person, intending to be influenced and rewarded in connection
with a business, transaction, and series of transactions of such
organization involving a thing of value of $5,000 and more, to
wit, EVANS, in his capacity as a coach for the men's basketball
team at University-2 and then University-3, solicited and
accepted cash and things of value from CHRISTIAN DAWKINS, MUNISH
SOOD, the defendants, and CW-1, among others, which were
intended to influence and reward EVANS in connection with the
business of University-2 and University-3.

(Title 18, United States Code, Section 666(a)(1)(B) and 2.)

## COUNT THREE

(Solicitation Of Bribes and Gratuities By An Agent Of A
Federally Funded Organization – EMANUEL RICHARDSON)

6.   From at least in or about March 2017, up to and
including in or about September 2017, in the Southern District
of New York and elsewhere, EMANUEL RICHARDSON, a/k/a "Book," the

defendant, being an agent of an organization that received, in a one-year period, benefits in excess of $10,000 under a Federal program involving a grant, contract, subsidy, loan, guarantee, insurance, and other form of Federal assistance, to wit, University-4, corruptly solicited and demanded for the benefit of a person, and accepted and agreed to accept, a thing of value from a person, intending to be influenced and rewarded in connection with a business, transaction, and series of transactions of such organization involving a thing of value of $5,000 and more, to wit, RICHARDSON, in his capacity as a coach for University-4 men's basketball team, solicited and accepted cash and things of value from CHRISTIAN DAWKINS, MUNISH SOOD, the defendants, and UC-1, among others, which were intended to influence and reward RICHARDSON in connection with the business of University-4.

(Title 18, United States Code, Sections 666(a)(1)(B) and 2.)

## COUNT FOUR

(Solicitation Of Bribes and Gratuities By An Agent Of A
Federally Funded Organization - ANTHONY BLAND)

7.     From at least in or about June 2017, up to and including in or about September 2017, in the Southern District of New York and elsewhere, ANTHONY BLAND, a/k/a "Tony," the defendant, being an agent of an organization that received, in a one-year period, benefits in excess of $10,000 under a Federal program involving a grant, contract, subsidy, loan, guarantee, insurance, and other form of Federal assistance, to wit, University-5, corruptly solicited and demanded for the benefit of a person, and accepted and agreed to accept, a thing of value from a person, intending to be influenced and rewarded in connection with a business, transaction, and series of transactions of such organization involving a thing of value of $5,000 and more, to wit, BLAND, in his capacity as a coach for University-5's men's basketball team, solicited and accepted cash and things of value from CHRISTIAN DAWKINS and MUNISH SOOD, the defendants, among others, which were intended to influence and reward BLAND in connection with the business of University-5.

(Title 18, United States Code, Sections 666(a)(1)(B) and 2.)

## COUNT FIVE

(Payments Of Bribes and Gratuities To An Agent Of A Federally
Funded Organization – CHRISTIAN DAWKINS and MUNISH SOOD)

8.    From at least in or about 2016, up to and including in
or about September 2017, in the Southern District of New York
and elsewhere, CHRISTIAN DAWKINS and MUNISH SOOD, the
defendants, corruptly did give, offer, and agree to give a thing
of value to a person, with intent to influence and reward an
agent of an organization, in connection with business,
transactions, and series of transactions of such organization
involving a thing of value of $5,000 and more, while such
organization was in receipt of, in any one year period, benefits
in excess of $10,000 under a Federal program involving a grant,
contract, subsidy, loan, guarantee, insurance, and other form of
Federal assistance, to wit, DAWKINS and SOOD offered and paid
bribes to multiple National Collegiate Athletic Association
("NCAA") men's basketball coaches, intending to influence and
reward those coaches in connection with the business of their
universities.

(Title 18, United States Code, Section 666(a)(2) and 2.)

## COUNT SIX

(Conspiracy to Commit Honest Services Fraud)

9.    From at least in or about 2016, up to and including in
or about September 2017, in the Southern District of New York
and elsewhere, LAMONT EVANS, EMANUEL RICHARDSON, a/k/a "Book,"
ANTHONY BLAND, a/k/a "Tony," CHRISTIAN DAWKINS, and MUNISH SOOD,
the defendants, and others known and unknown, willfully and
knowingly did combine, conspire, confederate, and agree together
and with each other to commit honest services wire fraud in
violation of Title 18, United States Code, Sections 1343 and
1346.

10.    It was a part and an object of the conspiracy that
LAMONT EVANS, EMANUEL RICHARDSON, a/k/a "Book," ANTHONY BLAND,
a/k/a "Tony," CHRISTIAN DAWKINS, and MUNISH SOOD, the
defendants, and others known and unknown, willfully and
knowingly, having devised and intending to devise a scheme and

6

artifice to defraud, and to deprive EVANS's, RICHARDSON's, and BLAND's respective employers of their intangible right to their employees' honest services, would and did transmit and cause to be transmitted by means of wire communication in interstate and foreign commerce, writings, signs, signals, pictures, and sounds for the purpose of executing such scheme and artifice, in violation of Title 18, United States Code, Sections 1343 and 1346, to wit, EVANS, RICHARDSON, and BLAND, through telephone communications and wire transfers of funds, among other means and methods, agreed to and did deprive their respective employers of their honest services by soliciting and receiving bribes, in exchange for which they agreed to and did exercise their influence as coaches at University-2, University-3, University-4, and University-5 to persuade and pressure student-athletes to retain the services of DAWKINS, SOOD, and CW-1, among others.

(Title 18, United States Code, Section 1349.)

### COUNT SEVEN

(Honest Services Wire Fraud – University-2 and University-3)

11.  From at least in or about 2016, up to and including in or about September 2017, in the Southern District of New York and elsewhere, LAMONT EVANS, the defendant, aided and abetted by CHRISTIAN DAWKINS and MUNISH SOOD, the defendants, willfully and knowingly, having devised and intending to devise a scheme and artifice to defraud, and to deprive University-2 and University-3 of its respective intangible rights to EVANS's honest services, and attempting to do so, would and did transmit and cause to be transmitted by means of wire communication in interstate and foreign commerce, writings, signs, signals, pictures, and sounds for the purpose of executing such scheme and artifice, to wit, EVANS, DAWKINS, and SOOD, through telephone communications and wire transfers of funds, among other means, agreed to and did deprive EVANS's employers of his honest services by soliciting and receiving bribes, in exchange for which EVANS agreed to and did exercise his influence as a coach at University-2 and University-3 to persuade and pressure student-athletes to retain the services of DAWKINS, SOOD, and CW-1, among others.

(Title 18, United States Code, Section 1343, 1346, 1349, and 2.)

## COUNT EIGHT

(Honest Services Wire Fraud – University-4)

12.   From at least in or about March 2017, up to and
including in or about September 2017, in the Southern District
of New York and elsewhere, EMANUEL RICHARDSON, a/k/a "Book," the
defendant, aided and abetted by CHRISTIAN DAWKINS and MUNISH
SOOD, the defendants, willfully and knowingly, having devised
and intending to devise a scheme and artifice to defraud, and to
deprive University-4 of its intangible right to RICHARDSON's
honest services, and attempting to do so, would and did transmit
and cause to be transmitted by means of wire communication in
interstate and foreign commerce, writings, signs, signals,
pictures, and sounds for the purpose of executing such scheme
and artifice, to wit, RICHARDSON, DAWKINS, and SOOD, through
telephone communications and wire transfers of funds, among
other means, agreed to and did deprive RICHARDSON's employer of
his honest services by soliciting and receiving bribes, in
exchange for which RICHARDSON agreed to and did exercise his
influence as a coach at University-4 to persuade and pressure
student-athletes to retain the services of DAWKINS and SOOD,
among others.

(Title 18, United States Code, Section 1343, 1346, 1349, and 2.)

## COUNT NINE

(Honest Services Wire Fraud – University-5)

13.   From at least in or about July 2017, up to and
including in or about September 2017, in the Southern District
of New York and elsewhere, ANTHONY BLAND, a/k/a "Tony," the
defendant, aided and abetted by CHRISTIAN DAWKINS and MUNISH
SOOD, the defendants, willfully and knowingly, having devised
and intending to devise a scheme and artifice to defraud, and to
deprive University-5 of its intangible right to BLAND's honest
services, and attempting to do so, would and did transmit and
cause to be transmitted by means of wire communication in
interstate and foreign commerce, writings, signs, signals,
pictures, and sounds for the purpose of executing such scheme
and artifice, to wit, BLAND, DAWKINS, and SOOD, through
telephone communications and wire transfers of funds, among
other means, agreed to and did deprive BLAND's employer of his

honest services by soliciting and receiving bribes, in exchange
for which BLAND agreed to and did exercise his influence as a
coach at University-5 to persuade and pressure student-athletes
to retain the services of DAWKINS and SOOD, among others.

(Title 18, United States Code, Section 1343, 1346, 1349, and 2.)

## COUNT TEN

### (Wire Fraud Conspiracy)

14.  From at least in or about 2016, up to and including in
or about September 2017, in the Southern District of New York
and elsewhere, EMANUEL RICHARDSON, a/k/a "Book," LAMONT EVANS,
ANTHONY BLAND, a/k/a "Tony," CHRISTIAN DAWKINS, and MUNISH SOOD,
the defendants, and others known and unknown, willfully and
knowingly did combine, conspire, confederate, and agree together
and with each other to commit wire fraud in violation of Title
18, United States Code, Section 1343.

15.  It was a part and object of the conspiracy that LAMONT
EVANS, EMANUEL RICHARDSON, a/k/a "Book," ANTHONY BLAND, a/k/a
"Tony," CHRISTIAN DAWKINS, and MUNISH SOOD, the defendants, and
others known and unknown, willfully and knowingly, having
devised and intending to devise a scheme and artifice to
defraud, and for obtaining money and property by means of false
and fraudulent pretenses, representations, and promises, would
and did transmit and cause to be transmitted by means of wire
and radio communication in interstate and foreign commerce,
writings, signs, signals, pictures, and sounds for the purpose
of executing such scheme and artifice, in violation of Title 18,
United States Code, Section 1343, to wit, EVANS, RICHARDSON,
BLAND, DAWKINS, and SOOD, and others known and unknown,
participated in a scheme to defraud University-2, University-3,
University-4, and University-5 by facilitating and concealing
bribe payments to prospective and current student-athletes at
those universities, and/or their families, including by
telephone, email, and wire transfers of funds, among other
means, thereby causing University-2, University-3, University-4,
and University-5 to provide athletic scholarships to student-
athletes who, in truth and in fact, were ineligible to compete
as a result of the bribe payments.

16.   It was a further part and object of the conspiracy that LAMONT EVANS, EMANUEL RICHARDSON, a/k/a "Book," ANTHONY BLAND, a/k/a "Tony," CHRISTIAN DAWKINS, and MUNISH SOOD, the defendants, and others known and unknown, willfully and knowingly, having devised and intending to devise a scheme and artifice to defraud, and for obtaining money and property by means of false and fraudulent pretenses, representations, and promises, would and did transmit and cause to be transmitted by means of wire and radio communication in interstate and foreign commerce, writings, signs, signals, pictures, and sounds for the purpose of executing such scheme and artifice, in violation of Title 18, United States Code, Section 1343, to wit, EVANS, RICHARDSON, BLAND, DAWKINS, and SOOD, and others known and unknown, participated in a scheme to defraud University-2, University-3, University-4, and University-5 by making and concealing bribe payments to prospective and current student-athletes at those universities, and/or their families, including by telephone, email, and wire transfers of funds, among other means, which deprived University-2, University-3, University-4, and University-5 of its right to control the use of its assets, including the decision of how to allocate a limited number of athletic scholarships, and which, if revealed, would have further exposed University-2, University-3, University-4, and University-5 to tangible economic harm, including monetary and other penalties imposed by the NCAA.

(Title 18, United States Code, Section 1349.)

## COUNT ELEVEN

(Travel Act Conspiracy)

17.   From at least in or about 2016, up to and including in or about September 2017, in the Southern District of New York and elsewhere, LAMONT EVANS, EMANUEL RICHARDSON, a/k/a "Book," ANTHONY BLAND, a/k/a "Tony," CHRISTIAN DAWKINS, and MUNISH SOOD, the defendants, and others known and unknown, willfully and knowingly did combine, conspire, confederate, and agree together and with each other to commit an offense against the United States, to wit, a violation of Title 18, United States Code, Section 1952.

18.   It was a part and object of the conspiracy that LAMONT EVANS, EMANUEL RICHARDSON, a/k/a "Book," ANTHONY BLAND, a/k/a

"Tony," CHRISTIAN DAWKINS, and MUNISH SOOD, the defendants, and others known and unknown, willfully and knowingly would and did travel in interstate commerce, and use and cause to be used the mail and facilities in interstate and foreign commerce, with the intent to distribute the proceeds of an unlawful activity, and to promote, manage, establish, carry on and facilitate the promotion, management, establishment and carrying on of an unlawful activity, to wit, the offering by SOOD, DAWKINS, and CW-1, and others known and unknown, and the acceptance by EVANS of commercial bribes, in violation of S.C. Code Ann. § 16-17-540 and 21 Okl. St. Ann. § 380, the acceptance by RICHARDSON of commercial bribes, in violation of A.R.S. § 13-2605, and the acceptance by BLAND of commercial bribes, in violation of Cal. Penal Code § 641.3, thereafter would and did perform and attempt to perform an act to distribute the proceeds of said unlawful activity, and to promote, manage, establish, carry on, and facilitate the promotion, management, establishment, and carrying on of said unlawful activity, in violation of Title 18, United States Code, Sections 1952(a)(1) and (a)(3).

## OVERT ACTS

19.   In furtherance of the conspiracy and to effect the illegal objects thereof, the following overt acts, among others, were committed in the Southern District of New York and elsewhere:

a.   On or about March 3, 2016, in South Carolina, LAMONT EVANS, CHRISTIAN DAWKINS, MUNISH SOOD, the defendants, and CW-1 met, during which meeting EVANS, DAWKINS, SOOD and CW-1 discussed, in sum and substance and in part, that EVANS could direct and influence certain student-athletes that EVANS coached at University-2 to retain the services of CW-1, SOOD, and DAWKINS.

b.   On or about April 19, 2016, EVANS met with CW-1 and SOOD in Manhattan, New York, during which meeting CW-1 provided EVANS with a cash bribe of $500.

c.   On or about February 3, 2017, EVANS met with CW-1 in West Virginia, during which meeting CW-1 provided EVANS with a cash bribe of $2,000 and EVANS introduced CW-1 to a University-3 basketball player.

d.   On or about June 20, 2017, SOOD, CW-1, and EMANUEL RICHARDSON, a/k/a/ "Book," the defendant, among others, met in Manhattan, New York, during which meeting RICHARDSON received a cash bribe of $5,000.

e.   On or about July 20, 2017, SOOD, RICHARDSON, and UC-1 met in New Jersey, during which meeting RICHARDSON received a cash bribe of $15,000.

f.   On or about July 29, 2017, DAWKINS, ANTHONY BLAND, a/k/a "Tony," the defendant, CW-1, and UC-1, among others, met in a hotel room in Las Vegas, Nevada. During the meeting, DAWKINS confirmed, in the presence of BLAND, that UC-1 had $13,000 with him intended for BLAND. Thereafter, DAWKINS took an envelope containing a $13,000 bribe payment from UC-1 and left the hotel room with BLAND.

(Title 18, United States Code, Section 371.)

The bases for deponent's knowledge and for the foregoing charges are, in part, as follows:

20.   I am a Special Agent with the FBI, and I have been personally involved in the investigation of this matter, which has been handled by Special Agents of the FBI and Criminal Investigators in the United States Attorney's Office for the Southern District of New York (the "USAO"). I have been employed by the FBI since 2014. I and other members of the investigative team have experience in fraud and corruption investigations and techniques associated with such investigations, including executing search warrants, financial analysis, wiretaps, and working with informants.

21.   This affidavit is based in part upon my own observations, my conversations with other law enforcement agents and others, my examination of documents and reports prepared by others, my interviews of witnesses, and my training and experience. Because this affidavit is being submitted for the limited purpose of establishing probable cause, it does not include all the facts that I have learned during the course of the investigation. Where the contents of documents, including emails, and the actions, statements and conversations of others

12

are reported herein, they are reported in substance and in part, except where specifically indicated otherwise.

## I.   OVERVIEW OF THE INVESTIGATION

22.   The charges in this Complaint result from a scheme involving bribery, corruption, and fraud in intercollegiate athletics.  Since 2015, the FBI and USAO have been investigating the criminal influence of money on coaches and student-athletes who participate in intercollegiate basketball governed by the NCAA.  As relevant here, the investigation has revealed numerous instances of bribes paid by athlete advisors – including financial advisors and business managers, among others – to assistant and associate basketball coaches employed by NCAA Division I universities, and sometimes directly to the student-athletes at NCAA Division I universities as facilitated by the coaches, in exchange for those coaches exerting their influence over student-athletes under their control to retain the services of the bribe-payors once the athletes enter the National Basketball Association ("NBA").

23.   As the investigation has revealed, by virtue of their official position with federally-funded universities, NCAA Division I men's basketball coaches have the ability to provide sports agents, financial advisors, business managers and others with access to the student-athletes whom they coach.  Moreover, many such coaches have enormous influence over the student-athletes who play for them, in particular with respect to guiding those student-athletes through the process of selecting agents and other advisors when they prepare to leave college and enter the NBA.  The investigation has revealed several instances in which coaches have exercised that influence by steering players and their families to retain particular advisors, not because of the merits of those advisors, but because the coaches were being bribed by the advisors to do so.

24.   The corrupt arrangements described herein are valuable both to the assistant and associate coaches, who receive cash bribes to deliver players to an advisor, and to the bribor agents or advisors, for whom securing a future NBA player as a client can prove extremely profitable.  Indeed, based on my review of publicly-available information and participation in this investigation, I am aware that certain NBA draft picks can and do make tens of millions of dollars over the course of their

13

NBA career, a portion of which they pay to their agents, and a portion of which they invest and have managed through their financial advisors and business managers, resulting in lucrative fees for those agents and advisors. As such, as detailed herein, agents and other athlete advisors attempt to recruit student-athletes early in their NCAA career, in violation of NCAA rules, including by paying bribes to the athletes' coaches and athletes and/or their families.

25.  This Complaint focuses on bribe payments solicited and received by three coaches at NCAA Division I men's basketball teams: LAMONT EVANS, EMANUEL RICHARDSON, a/k/a "Book," and ANTHONY BLAND, a/k/a "Tony," the defendants, and facilitated by CHRISTIAN DAWKINS and MUNISH SOOD, the defendants, as well as by a cooperating witness who has been providing information to law enforcement as a part of this investigation ("CW-1"),[2] and two undercover FBI agents posing as CW-1's business partners and financial backers ("UC-1" and "UC-2"). In exchange for the bribes, EVANS, RICHARDSON, and BLAND agreed to direct certain student-athletes under their supervision to retain the business management and financial advisory services of DAWKINS, SOOD and and/or CW-1.

---

[2] Based on my participation in the investigation, including my debriefings of CW-1, I am aware that CW-1 ran a business management firm that primarily serviced professional athletes, as well as a registered investment advisory firm that provided investment related services to CW-1's clients, including athletes. Information provided by CW-1 has been corroborated by, among other things, recorded conversations, electronic communications, and surveillance by law enforcement. CW-1 began cooperating with the Government in or about November 2014. CW-1's activities described in this Complaint were conducted at the direction of law enforcement. In or about September 2017, CW-1 pleaded guilty to securities fraud, wire fraud, aggravated identity theft, and making false statements pursuant to a cooperation agreement with the Government. On or about May 6, 2016, CW-1 agreed to settle civil charges filed by the Securities and Exchange Commission relating to CW-1's violations of certain securities laws.

## II.   BACKGROUND ON THE NCAA AND RELEVANT NCAA RULES

26.   Based on my participation in this investigation, my review of publicly available information, and my conversations with other law enforcement agents who have reviewed such information, I have learned the following:

a.   The NCAA is a non-profit organization headquartered in Indianapolis, Indiana, which regulates athletics for over 1,000 colleges and universities, conferences, and other associations.  NCAA member schools are organized into three separate Divisions: Division I, Division II, and Division III.  University-2, University-3, University-4, and University-5 all are in NCAA's Division I, which is the highest level of intercollegiate athletics sanctioned by the NCAA.

b.   Division I schools typically have the biggest student bodies, manage the largest athletics budgets and offer the most athletic scholarships.  Among other things, Division I schools must offer a minimum amount of financial assistance (in the form of scholarships) to their athletes; however, the NCAA sets a maximum number of scholarships available for each sport that a Division I school cannot exceed.  Currently, teams may offer no more than 13 athletic scholarships for the 2017-2018 men's basketball season.

27.   The official rulebook governing Division I schools is the NCAA Division I Manual (the "Manual"), which is published annually and which contains the NCAA Constitution and its operating bylaws (the "Bylaws").  Based on my review of the Manual, I have learned the following, in relevant part:

a.   Among the NCAA's core principles for the conduct of intercollegiate athletics is a directive that "[s]tudent-athletes shall be amateurs in an intercollegiate sport;" and that "student-athletes should be protected from exploitation by professional and commercial enterprises."  The Constitution further states that "an institution found to have violated the [NCAA]'s rules shall be subject to disciplinary and corrective actions as may be determined by the [NCAA]."

b.   Consistent with the NCAA's core principles, any financial assistance to student-athletes other than from the university itself or the athletes' legal guardians is prohibited

15

without express authorization from the NCAA. In addition, neither student-athletes, prospective student-athletes, nor their relatives can accept benefits, including money, travel, clothing or other merchandise directly or indirectly from outside sources such as agents[3] or financial advisors. A student-athlete is rendered "ineligible" to participate in Division I sports if the athlete is recruited by a university or any "representative of its athletics interests" in violation of NCAA rules.

     c.   Coaches and other team staff at NCAA Division I schools also are subject to various prohibitions, including on (i) facilitating contact between student-athletes and agents or financial advisors; and (ii) receiving compensation directly or indirectly from outside sources with respect to any actions involving the student-athletes.

   28.  Based on my review of the NCAA Constitution and its Bylaws, I have learned that student-athletes, coaches, and staff members of athletics departments must complete annual certifications regarding their knowledge of NCAA rules violations, and, in the case of student-athletes, their continued eligibility to participate in NCAA-sponsored sports. In particular:

     a.   On an annual basis, a student-athlete must "sign a statement . . . in which the student-athlete submits information related to eligibility, recruitment, financial aid, [and] amateur status," which is known as the "Student-Athlete Statement." In the Student-Athlete Statement, the student-athlete represents, among other things, that "[a]ll information provided to the NCAA . . . and the institution's admissions office is accurate and valid, including . . . [his] amateur status" and that the student-athlete has "reported to [his]

---

[3] The NCAA Division I Bylaws define an "agent" broadly as "any individual who, directly or indirectly, . . . seeks to obtain any type of financial gain or benefit . . . from a student-athlete's potential earnings as a professional athlete." Specifically included in the definition of "agent" is, among others, "a certified contract advisor, financial advisor, marketing representative, brand manager or anyone who is employed or associated with such persons."

director of athletics . . . any violations of NCAA regulations involving [him] and [his] institution." Furthermore, in signing the Student-Athlete Statement, the Student-Athlete certifies that "to the best of [his] knowledge, [he] has not violated any amateurism rules," and has "not provided false or misleading information concerning [his] amateur status to the NCAA . . . or the institution's athletics department."

   b.   Coaches and staff members must certify annually that they have reported to their university any knowledge of violations of NCAA rules involving their institution.

   c.   In addition, the Bylaws prohibit student-athletes, coaches and staff members of athletics departments from "knowingly furnishing or knowingly influencing others to furnish the NCAA or the individual's institution false or misleading information concerning an individual's involvement in or knowledge of matters relevant to a possible violation of an NCAA regulation."

   29.   As set forth in the Bylaws, violations of NCAA rules by a university or any individual may lead to penalties including, but not limited to, limitations on a university's "participation in postseason play in the involved sport"; financial penalties including "requirements that an institution pay a fine, return revenue received from a specific athletics event or series of events, or . . . reduction[s] in or elimination of monetary distribution by" the NCAA; "limitations on the number of financial aid awards that may be provided" by the university to student-athletes; and recruiting restrictions including on the ability to conduct off-campus recruiting activities or to communicate by telephone or letter with prospective student-athletes.

## III.   RELEVANT INDIVIDUALS AND ENTITIES

### A. University-2

   30.   Based on my review of publicly available information, I have learned that University-2 is a public research university located in South Carolina. With over approximately 30,000 students, it is one of South Carolina's largest universities. University-2 fields approximately 19 varsity sports teams in NCAA Division I competition, including men's basketball.

31.   I know from publicly available information that, in each year relevant to this Complaint, University-2 received funds from the federal government in excess of $10,000 per year.

### B. University-3

32.   Based on my review of publicly available information, I have learned that University-3 is a public research university located in Oklahoma.  With over 25,000 students, it is one of Oklahoma's largest universities.  University-3 fields approximately 16 varsity sports teams in NCAA Division I competition, including men's basketball.

33.   I know from publicly available information that, in each year relevant to this Complaint, University-3 received funds from the federal government in excess of $10,000 per year.

### C. University-4

34.   Based on my review of publicly available information, I have learned that University-4 is a public research university located in Arizona.  With over 40,000 students, it is one of Arizona's largest universities.  University-4 fields approximately 18 varsity sports teams in NCAA Division I competition, including men's basketball.

35.   I know from publicly available information that, in each year relevant to this Complaint, University-4 received funds from the federal government in excess of $10,000 per year.

### D. University-5

36.   Based on my review of publicly available information, I have learned that University-5 is a private research university located in California.  With over approximately 40,000 students, it is one of California's largest universities.  University-5 fields approximately 21 varsity sports teams in NCAA Division I competition, including men's basketball.

37.   I know from publicly available information that, in each year relevant to this Complaint, University-5 received funds from the federal government in excess of $10,000 per year.

### E. Sports Management Company-1

38.   Based on my participation in this investigation, including my discussions with CW-1 and my review of publicly available information, I have learned that during all times relevant to this Complaint, Sports Management Company-1 ("SMC-1") was a sports agency firm with headquarters based in New Jersey that specialized in the representation of professional basketball players.  In or about 2016, SMC-1 had approximately 38 clients, including many current NBA players, approximately 10 employees, and approximately $484.35 million in contract value under management.

### F. LAMONT EVANS

39.   Based on my participation in this investigation, including my review of publicly available information, I have learned that, from in or about 2012 through in or about April 2016, LAMONT EVANS, the defendant, served as an assistant coach for the NCAA Division I men's basketball program at University-2.  In or about April 2016, EVANS was hired by University-3 as the associate head coach for its Division I men's basketball program.  While in college, EVANS played on an NCAA Division I men's college basketball team.  EVANS also played professional basketball internationally, including in Slovenia, Germany, Finland, and Venezuela.

### G. EMANUEL RICHARDSON

40.   Based on my participation in this investigation, including my review of publicly available information, I have learned that EMANUEL RICHARDSON, a/k/a "Book," the defendant, is an assistant coach for the NCAA Division I men's basketball program at University-4.  RICHARDSON was hired by University-4 as an assistant coach in or about 2009, and previously worked as an assistant coach at another NCAA Division I men's basketball program.

### H. ANTHONY BLAND

41.   Based on my participation in this investigation, including my review of publicly available information, I have learned that ANTHONY BLAND, a/k/a "Tony," the defendant, is the associate head coach for the NCAA Division I men's basketball

program at University-5, and prior to that was an assistant coach at University-5. While in college, BLAND played for an NCAA Division I men's basketball program at another university, and in high school he was an All American basketball player.

## I. CHRISTIAN DAWKINS

42. Based on my review of publicly available information, and my review of calls and conversations recorded as a part of this investigation, I have learned that CHRISTIAN DAWKINS, the defendant, was an employee of SMC-1 between in or about 2015 until in or about May 2017. Although DAWKINS is not a registered agent, the investigation has revealed that DAWKINS's job at SMC-1 primarily consisted of recruiting athletes as clients and maintaining client relationships for the firm. In or about May 2017, SMC-1 terminated DAWKINS in connection with DAWKINS's alleged use of an athlete's credit card to pay for expenses from a ride services company without the athlete's authorization. Since that time, as detailed below, DAWKINS has endeavored to start his own sports management business with the assistance of MUNISH SOOD, the defendant, among others.

## J. MUNISH SOOD

43. Based on my participation in this investigation, including my review of publicly-available information, I have learned that MUNISH SOOD, the defendant, is the founder of an investment services company ("the Investment Company") and serves as its Chief Investment Officer. The Investment Company was founded in or about 2002 to provide investment management services to institutional and family office clients. SOOD is a registered investment advisor. Based on my conversations with CW-1, I have learned that CW-1 met SOOD in or about 2011 or 2012, and that SOOD and CW-1 have known and worked with each other for several years.

## IV.   ALLEGATIONS INVOLVING LAMONT EVANS

44. As set forth in more detail herein, beginning in 2016, and continuing into 2017, MUNISH SOOD, the defendant, and CW-1 – having learned from CHRISTIAN DAWKINS, the defendant, that DAWKINS previously had paid bribes to LAMONT EVANS, the defendant, in order to obtain access to student-athletes coached by EVANS – paid at least $22,000 in bribes to EVANS in exchange

for EVANS's agreement to exert his official influence over certain student-athletes that EVANS coached, first at University-2, and then at University-3, to retain SOOD and CW-1's business advisory and/or investment management services once those players entered the NBA. As a result of the bribes, EVANS promised DAWKINS, SOOD and CW-1 that he would steer multiple specific players to them, and arranged for CW-1 to meet with a student-athlete on the NCAA Division I men's basketball team at University-3 in connection with EVANS's attempt to influence the player to retain DAWKINS, SOOD and CW-1.

## A.   *DAWKINS and CW-1 Discuss Bribing LAMONT EVANS*

45.   In or about the Spring of 2015, CW-1 was introduced to CHRISTIAN DAWKINS, the defendant, by Rashan Michel,[4] who is the owner of a bespoke clothing company that has a client base consisting predominantly of professional athletes.[5] During this time, and prior to CW-1's cooperation with law enforcement, Michel and CW-1 had discussed the fact that DAWKINS previously had paid bribes to college coaches and student-athletes. Once CW-1 began cooperating with law enforcement, CW-1 asked DAWKINS if DAWKINS knew any current basketball coaches who would be willing to accept bribes in order to steer the players they coached to CW-1's business management and financial advisory company. In several telephone conversations recorded by CW-1, DAWKINS and CW-1 discussed, among other things, providing funds

---

[4] Michel is named as a defendant in a separate, related Complaint filed today. *See United States* v. *Chuck Connors Person, et al.*, 17 Mag. _____.

[5] Except as otherwise indicated, the bases for my knowledge of the facts described in this Complaint are my participation in this investigation; my training and experience; my discussions with CW-1, UC-1 and UC-2; and my review of the entirety of each recorded telephone call or meeting cited herein, and, where available, a transcript of the call or meeting. For every instance in which I offer my interpretation of language used during a recorded telephone call or meeting, that interpretation is based on my training, experience, and participation in this investigation, my review of the larger universe of recorded telephone calls and meetings contained herein, and my discussions with CW-1, UC-1 and UC-2.

directly to college basketball players and/or their families as
a method by which to recruit athletes to retain CW-1's services
when they entered the NBA; additionally, DAWKINS informed CW-1
that DAWKINS was in contact with a basketball coach at
University-2 (later revealed to be LAMONT EVANS, the defendant)
who was willing to accept bribes in exchange for directing
student-athletes under his supervision to retain CW-1's
services.

46.   In or about December 2015, CHRISTIAN DAWKINS, the
defendant, and CW-1 spoke by telephone on a call recorded by CW-
1.   On the call, DAWKINS and CW-1 discussed the "[University-2]
situation," and DAWKINS informed CW-1 that he had spoken to the
coach at University-2 (later identified as LAMONT EVANS, the
defendant) and "told him that the money would be coming from
you." DAWKINS further informed CW-1 that they would need to
travel to South Carolina, where University-2 is located, to meet
with EVANS. DAWKINS also provided further detail regarding the
amount and timing of the bribe payments to EVANS, noting that
CW-1 would be expected to make payments of approximately "25,"
*i.e.* $25,000, paid in $8,000 installments in January, February,
and March of 2016, in exchange for EVANS's agreement to steer
student-athletes to retain CW-1.

47.   At around the same time, in or about December 2015,
CW-1 discussed with MUNISH SOOD, the defendant, the possibility
of working together to recruit college athletes as potential
future clients. CW-1 informed SOOD of, among other things, his
recent dealings with CHRISTIAN DAWKINS, the defendant, and
DAWKINS's relationship with a coach at University-2 who was
willing to receive bribes in exchange for directing Division I
men's basketball players that he coached to retain CW-1's and
SOOD's advisory services.

48.   On or about January 20, 2016, CHRISTIAN DAWKINS, the
defendant, and CW-1 spoke by telephone. During the call, which
CW-1 recorded, DAWKINS and CW-1 discussed, among other things,
setting up a meeting with the University-2 men's basketball
coach (later identified as LAMONT EVANS, the defendant) in or
about early February 2016. CW-1 also raised with DAWKINS the
possibility that MUNISH SOOD, the defendant, would participate
in making payments to the coach at University-2.

49.   On or about February 15, 2016, CHRISTIAN DAWKINS, the

defendant, and CW-1 spoke by telephone on a call recorded by CW-1. During the call, DAWKINS and CW-1 discussed traveling with MUNISH SOOD, the defendant, to meet the University-2 coach. DAWKINS told CW-1 that he had "open access" to the coach, and that he did not "even have to call -- I can call him early when we land be like 'yo we coming down.'" During subsequent recorded conversations with CW-1 in or about February 2016, DAWKINS revealed to CW-1 that the coach at University-2 was LAMONT EVANS, the defendant.

### B. DAWKINS Introduces CW-1 and SOOD to EVANS; CW-1 and EVANS Discuss Bribe Payments and Future Clients for CW-1

50.   On or about March 3, 2016, CW-1 met with CHRISTIAN DAWKINS, MUNISH SOOD, and LAMONT EVANS, the defendants, at a restaurant in the vicinity of University-2's campus. During the meeting, which CW-1 audio and video recorded, the group discussed current University-2 basketball players coached by EVANS, whom EVANS could arrange to retain the services of CW-1 and/or SOOD in exchange for bribes. Specifically, after DAWKINS introduced EVANS to CW-1 and SOOD, the following occurred, in substance and in part:

a.   DAWKINS, CW-1, SOOD, and EVANS discussed a specific student-athlete on University 2's NCAA Division I basketball team ("Player-3") that EVANS presently was coaching at University-2. DAWKINS opined that "agents obviously have influence, but you gotta get the college coaches too" because "it's almost like you skipping a step if you just deal with agents." DAWKINS further stated to SOOD and CW-1 that they "need[ed] to be involved with people like Lamont [EVANS], because, like you said, he know[s] the player," and would be the first person to see Player-3 every day. Moreover, according to DAWKINS, paying EVANS would not only lead to signing Player-3 as a client, but also to signing "five [Player-3s] down the line." DAWKINS explained that SOOD and CW-1 had "to get in bed with somebody like [EVANS] now so you got complete access to a kid . . . because if the coach says nobody can come around – can't nobody fucking come around."

b.   DAWKINS explained to SOOD and CW-1 that the "good thing about fucking with a college coach" was that there would

be "good players every year," to which EVANS responded that
working with a coach "keeps the relationship." According to
DAWKINS, the path to securing commitments from college athletes
was through assistant coaches such as EVANS because "the head
coach . . . ain't willing to [take bribes] 'cause they're making
too much money. And it's too risky."

       c.   DAWKINS further told SOOD and CW-1 that college
athletes were "trying to place their trust in people," and
SOOD's involvement in a "bank" would add "legitimacy" to their
scheme.[6]  SOOD agreed that "in this business all you have is
trust."

      51.   At the end of the March 3, 2016 meeting, CHRISTIAN
DAWKINS and MUNISH SOOD, the defendants, and CW-1 drove back to
Atlanta, Georgia together and continued to discuss their plan to
bribe college coaches to use their influence over college
basketball players to retain DAWKINS, SOOD and CW-1. During
their conversation, which was recorded by CW-1:

       a.   DAWKINS explained that coaches like EVANS could
not get "caught" receiving bribes because "his job is on the
line," and so EVANS and other corrupt coaches would have an
incentive to "block" other athlete advisors from accessing the
players under the coaches' supervision. DAWKINS further stated
to SOOD and CW-1 during the car ride that it was "better" to
work with an assistant coach – as opposed to a head coach –
"because then you got direct access" to the athletes.

       b.   DAWKINS told SOOD and CW-1 that he previously had
given EVANS $2,500 per month "for a couple of months," and that
DAWKINS "would just come do the [money] drop" in South Carolina,
or Atlanta (where EVANS often recruited high school players),
explaining that he would "see [EVANS] in Atlanta, go to the bank
. . . Give him $2500." DAWKINS added that a positive aspect to
having to pay EVANS the bribes in person was that "the more
times you're down [in South Carolina]. . . the more you see
[Player-3] . . . . The more you see his mom or the more she sees

---

[6] Based on my review of a publicly available website for SOOD's
Investment Company, I am aware that SOOD founded a bank in New
Jersey in 2007.

24

you at the games."

52. On or about March 7, 2016, LAMONT EVANS, the defendant, sent a text message to CW-1, which I have reviewed, stating "Lamont Evans nice meeting and speaking give me a call when you can. Thanks. . ." After receiving the text message, CW-1, at the direction of law enforcement, called EVANS. During the call, which CW-1 recorded, EVANS informed CW-1 that he had spoken with CHRISTIAN DAWKINS, the defendant, the previous night and told DAWKINS that EVANS hoped that he and CW-1 "can get together in the future and do some things." EVANS further stated to CW-1 that he was calling CW-1 from his personal cellphone, adding "we good, it's my personal cell," and confirmed that he was "on board with everything" and that he hoped that MUNISH SOOD, the defendant, and CW-1 also were comfortable with the arrangement. EVANS agreed with CW-1 that they would meet in person soon, adding "we'll go from there."

### C.   EVANS Is Hired By University-3 and EVANS and CW-1 Agree to Exchange Bribes for Players

53. On or about April 4, 2016, LAMONT EVANS, the defendant, was hired as an assistant coach for the NCAA Division I men's basketball team at University-3.[7] The next day, on or about April 5, 2016, EVANS and CW-1 spoke by telephone. During the call, which CW-1 recorded, EVANS informed CW-1 that he had taken a new job with University-3, explaining that it was a "better job" because it was "[b]etter players, more, more, more business." In response to an inquiry by CW-1 about how EVANS's move to University-3 would affect their earlier discussions regarding Player-3, EVANS assured CW-1 that he had spoken to Player-3's family and "it's always gonna be business with them. The mom text me." EVANS added that he wanted to start making payments to Player-3 and his family "to make sure they're solidified as far as things getting done on their end. You know what I mean?" CW-1 agreed, and he and EVANS tentatively planned to meet in New York City in or about mid-April 2016 to, as EVANS

---

[7] Based on my review of publicly available sources I have learned that on or about March 28, 2017, University-3 announced that EVANS would be promoted to the position of associate head coach for its basketball team.

stated, "sit down and go over everything."

54.   On or about April 19, 2016, LAMONT EVANS and MUNISH
SOOD, the defendants, met with CW-1 at a hotel located in
Manhattan, New York.   CW-1 audio and video recorded the meeting.
At the direction of law enforcement, CW-1 brought $500 with him
in cash to the meeting.   During the meeting, SOOD told CW-1 that
EVANS had informed SOOD before CW-1 arrived that "when the time
comes, he'll put us in front of" Player-3 and his family.   CW-1
asked EVANS how Player-3 had responded when he found out that
EVANS was leaving University-2 for University-3, and EVANS
stated that he had told Player-3 about the move "before I even
told the head coach" at University-2, and that Player-3 was
"good" with the decision.   EVANS added that Player-3 would be a
"first round pick" in the NBA draft the following year.   SOOD
then asked EVANS if he would "recommend [that Player-3] go to
Dawkins," and EVANS responded that DAWKINS had to do "some other
things too" for EVANS because DAWKINS had left EVANS "hanging a
little bit on some things."   SOOD informed EVANS that he and CW-1
wanted to "work with" EVANS.   SOOD left the meeting before CW-1,
and told EVANS that he would see him in Miami the following
month.   After SOOD departed, EVANS and CW-1 continued to speak in
the lobby of the hotel.   Towards the end of the meeting, CW-1
gave EVANS $500 in cash.

55.   Over the course of the spring 2016, LAMONT EVANS, the
defendant, and CW-1 engaged in numerous recorded telephone calls
in which EVANS sought to confirm the details of the bribe
payments that he would receive from SOOD and CW-1, including
money EVANS wanted for himself, and money EVANS intended to use
to recruit athletes to University-3's men's basketball team.   The
conversations during this time also focused on the players that
EVANS would steer to CW-1 in exchange for bribes.

a.   On an April 29, 2016 telephone call, EVANS sought
assurances that CW-1 would be able to pay EVANS.   EVANS proposed
that CW-1 "come up with something" and that they "go through it"
because "at the end of the day it's [a] negotiation and it's
nothing we're gonna kill each other over.   We're friends before
we did any business so I'm telling you, trust me, it's not too
low not too high."   EVANS added that he "just want[ed] to be able
to scratch my back, scratch yours, and help each other with
different things and . . . at the same time get compensated and
then . . . just go from there."   EVANS noted that their agreement

26

was just "generating more wealth," and that there could be
"another situation down the road for everybody . . . for [you]
to get certain guys."

        b.    On a May 3, 2016 telephone call, EVANS informed
CW-1 that he had received a pair of high-end headphones that
EVANS had requested from CW-1.[8]  CW-1 then informed EVANS that he
would agree to pay EVANS $2,000 per month, as CW-1, EVANS and
CHRISTIAN DAKWINS, the defendant, previously had discussed.
EVANS then turned the conversation to a specific student-athlete
he was coaching at University-3 that he wanted to connect with
CW-1.  EVANS informed CW-1 that "I've got a kid right now that I
want you guys to get involved with early on in the process.  When
we get him, I want to just have him – you guys – meet with him
ASAP before anybody does."  EVANS added, "let me know when we
need to start it," and CW-1 confirmed to EVANS that he would
"get it rolling."

        56.   From May to July 2016, LAMONT EVANS, the defendant,
spoke with CW-1 on numerous occasions by telephone.  On those
telephone calls, all of which were recorded by CW-1, EVANS and
CW-1 discussed the logistics of making the $2,000 per month
payments to EVANS in exchange for EVANS assisting CW-1's efforts
to recruit University-3 basketball players as future clients.  In
addition, EVANS asked CW-1 if CW-1 would be able to make
occasional separate payments to EVANS that EVANS would provide
to high school prospects that he wished to recruit to
University-3, clarifying, however, that any money that CW-1
provided to EVANS to assist him with recruiting players would be
"totally separate" from the $2,000 monthly payments that they
had previously discussed.

### D.    *EVANS, SOOD and CW-1 Meet in Miami; CW-1 Continues*
###        *Providing Bribe Payments to EVANS*

        57.   On or about August 3, 2016, LAMONT EVANS, the
defendant, and CW-1 spoke by telephone.  During the call, which
CW-1 recorded, EVANS and CW-1 discussed meeting in Miami in
order to discuss further the payments to EVANS.  EVANS stated

---

[8] On or about April 28, 2016, CW-1, at the direction of law
enforcement, sent a pair of headphones valued at approximately
$300 by mail to EVANS at EVANS's request.

that he wanted to discuss "all the other stuff, you know, about putting money, you know, just breaking up pieces and stuff." CW-1 suggested that he and EVANS meet the next day, August 4, and then that they meet together with MUNISH SOOD, the defendant, on August 5 because SOOD had asked for assurances that, in exchange for the payments, that "we got [Player-3]." EVANS said he understood, and further wanted to confirm that SOOD knew "about the other part – of just taking care" of some of the student-athletes' needs while they were at University-3. CW-1 informed EVANS that he would provide a payment to EVANS the next day in Miami when they met separately from SOOD, and that SOOD would give EVANS an additional payment when the three of them met on August 5. EVANS agreed but expressed concern that, although CW-1 would be able to pay CW-1's portion of the monthly bribes to EVANS, he was not sure if SOOD would "take care of his part." CW-1 assured EVANS that SOOD would pay his share. EVANS later added that he "just want[ed] to make sure we're squared away on the dollar amount" and requested that CW-1 pay him "in small a bills as possible."

    58.  On or about August 4, 2016, CW-1 met with LAMONT EVANS, the defendant, at a restaurant located in Miami, Florida. CW-1 audio and video recorded the meeting. At the direction of law enforcement, CW-1 brought $1,000 in cash with him to the meeting. During the meeting, EVANS discussed steering another student-athlete on the University-3 men's basketball team to SOOD and CW-1, after which EVANS accepted the $1,000 bribe. Specifically, at the August 4 meeting, the following occurred, in substance and in part:

        a.  EVANS and CW-1 discussed specific players that EVANS could direct to sign with CW-1 as future clients, including a player who EVANS anticipated would be joining the University-3 basketball team for the 2017-2018 season. In particular, EVANS stated, "Every guy I recruit and get is my personal kid. . . . All right. . . The . . . 7'1" kid coming in next year, you guys going to get [him]." EVANS explained that the student-athletes he coached were "one and done, two and done" – i.e., they would play one or two years of collegiate basketball before joining the NBA draft – and that there would be "no buffer" between the basketball players at University-3 and SOOD and CW-1. EVANS further promised that he would use his influence over the athletes to say "hey guys, this is what you do," referring to retaining SOOD and CW-1, and added that "the

parents believe in me and what I do. . . That's why I say, if I need X, so if I do take X for that, it's going to generate [business] toward you guys."

   b.   During the meeting, CW-1 provided EVANS with an envelope containing $1,000 in cash.  After CW-1 handed the envelope to EVANS, EVANS asked what the "number" was in the envelope, and whether SOOD had the rest of the payment.  CW-1 confirmed that SOOD would be providing the rest of the payment to EVANS at their meeting the next day.

   59.   On or about August 5, 2016, LAMONT EVANS and MUNISH SOOD, the defendants, met with CW-1 at a hotel located in Miami, Florida.  Based on my discussions with an investigator from the USAO ("Investigator-1") and my discussions with CW-1, I have learned that, while CW-1 attempted to record the meeting, his recording device malfunctioned and no recording was made.  Based on my discussions with Investigator-1 and CW-1, I have learned that, at the August 5 meeting, EVANS said that he expected money from SOOD and CW-1, and CW-1 informed SOOD, in the presence of EVANS, that he had given EVANS $1,000 the previous day.  EVANS, SOOD, and CW-1 further discussed Player-3, who had been coached by EVANS the previous season at University-2.  Although EVANS anticipated that SOOD would be providing EVANS with a cash payment at the meeting, SOOD did not provide such payment that day.

   60.   Following their meeting on August 5, LAMONT EVANS, the defendant, and CW-1 spoke by telephone on a call that was recorded by CW-1.  During the call, CW-1 and EVANS spoke about how they were displeased by the fact that MUNISH SOOD, the defendant, had failed to provide EVANS with the agreed-upon payment at the meeting.  In particular:

   a.   EVANS stated, "That's why I'm like, the two grand a month, that's like what you guys going to get from – that's, like. . . the guys that I recruit, even if you don't know them, they're going to be locked in regardless."  EVANS explained that, if any player doubted whether EVANS received any financial incentive to steer his players to SOOD and CW-1, he would deny it and tell them that "I got y'all on the investment end, you guys are good."  Referring to SOOD and CW-1, EVANS stated that he would vouch for them with the players and only refer his players to SOOD and CW-1, and would "bury" any other athlete advisors

29

that attempted to recruit the players that EVANS coached. EVANS noted, however, that, because of his ability to ensure that the athletes under his supervision would sign as clients with SOOD and CW-1, he might ask for an additional five or seven thousand dollars "at the end of the day for delivering" the athlete to them "and keeping everybody [else] out."

      b.    During the call, in response to CW-1's statement that EVANS should not lose faith in SOOD and CW-1 despite SOOD's failure to pay EVANS at the meeting, EVANS responded, "but that's what I'm saying. And it's like, I know what I can do. I know what I can do with the seven right now, the eight, whatever, because I need it. Because I'm telling you, it locks in two [players]. . . . Not for the future -- but right now." EVANS continued, "Literally, I'm working kind of not backwards, but I'm working for you guys to help my situation. But at the same time, I can go to all these different dudes, . . . and say, you know, you know what, what's it going to take to get this shit done. I got guys want to give 50 grand. I'm like, 'no.'. . . I'm not taking 50 grand, because you all, you all won't take it — think it's like that every time. And you all can buy people. No, meaning not you guys; meaning these other folks, like, what it going to take to get a kid. No, motherfucker. You got to develop a relationship."

    61.    Based on text messages that I have reviewed on CW-1's telephone, I know that, on or about August 18, 2016, LAMONT EVANS, the defendant, sent a text message to CW-1 that provided account information for a bank account in the name of EVANS's wife. Shortly thereafter, EVANS sent another text message with the names of three college basketball players: Player-3 of University-2; another player who at the time was a sophomore on University-2's men's basketball team; and a third player who at the time was an incoming freshman at University-3's men's basketball team.[9]

---

[9] CW-1, at the direction of law enforcement, ultimately never sent the wire transfer requested by EVANS in this text message.

### E. EVANS Steers a University-3 Basketball Player to CW-1 In Exchange For Bribes

62.   Throughout the 2016-2017 NCAA Division I men's basketball season, LAMONT EVANS, the defendant, continued to receive bribe payments from CW-1. As is described below, in exchange for these payments, EVANS, among other things, set up an in-person meeting between CW-1 and a current player on University-3's basketball team whom EVANS coached ("Player-4"), and used his official position to influence Player-4 to retain CW-1's services upon turning professional, all in violation of, among other things, NCAA rules and EVANS's duty to his employer, University-3.

63.   For example, on or about February 1, 2017, LAMONT EVANS, the defendant, and CW-1 spoke by telephone. During the call, which CW-1 recorded, EVANS and CW-1 discussed meeting in West Virginia on February 3, 2017, in advance of a basketball game that University-3's team would be playing on February 4.[10] EVANS told CW-1 that EVANS would introduce CW-1 to two student-athletes whom he coached and whom EVANS believed would be drafted into the NBA.

64.   As agreed, on or about February 3, 2017, CW-1 traveled to West Virginia at the direction of law enforcement to meet with LAMONT EVANS, the defendant, prior to University-3's basketball game the following day. After arriving in West Virginia, CW-1 spoke to EVANS by telephone. During the call, which CW-1 recorded, EVANS told CW-1 that he had "already spoken to one of the kids," who was later revealed to be Player-4, and described Player-4 as "one of the best [NBA] prospects." CW-1 asked how much the player knew about CW-1, and EVANS responded

---

[10] The February 3, 2017 meeting was set up on a recorded telephone call between EVANS and CW-1 on January 23, 2017. On that call, CW-1 also informed EVANS that he would send him a payment via wire transfer. Based on my participation in this investigation, and my review of financial records, I know that on or about January 24, 2017, CW-1 sent $2,000 via a wire transfer to a bank account designated by EVANS. The money had been provided in advance by the FBI to CW-1.

that EVANS "didn't drop a name, but I just told him my guy's coming. . . . So I laid down the landscape, you know what I mean? You know, the process, this is how it's going to work, and you're doing your thing, and, you know, these guys got — I mean, I told them how connected you were, you know, far as just financially, putting them in place, helping them after basketball, during basketball, you know, and stuff like that, you know what I mean?" EVANS noted that Player-4 was "not one of the kids that are going to need no 40 grand or 30 grand on the top, you know what I mean? Just, he just knows so long as I'm taken care of, so he's going to be loyal." EVANS then informed CW-1 that he had set up a meeting between CW-1 and Player-4 in EVANS's hotel room.

65.   Later that same day, LAMONT EVANS, the defendant, and CW-1 met in EVANS's hotel room.  Player-4 eventually entered the hotel room and spoke with EVANS and CW-1 about CW-1's business management services.[11] CW-1 audio and video recorded the meeting. During the meeting, EVANS repeatedly touted CW-1's ability to help Player-4, and pressured Player-4 to use CW-1's services. After Player-4 left the room, CW-1 gave EVANS a $2,000 cash bribe, which had been provided to CW-1 in advance by the FBI. Specifically, the following occurred at the meeting:

a.   Prior to Player-4 joining the meeting, EVANS told CW-1 that Player-4 was "the motherfucker that's scoring 22 points a game. . . . NBA people coming to see [him] and I'm getting feedback. He's a pro." EVANS then informed CW-1 that EVANS was hoping to get funds from CW-1 in order to help recruit a particular high school athlete to University-3. EVANS stated that, although the athlete had committed to EVANS and the University-3 men's basketball program, EVANS explained that he needed funds to secure a commitment from the athlete's mother and because the athlete would "be thinking about business, you know what I mean?" CW-1 promised to get back to EVANS about whether CW-1 would be able to secure funds for the high school athlete and his family to ensure that the athlete attended

─────────────────────

[11] At the beginning of the meeting, CW-1 provided EVANS with another pair of high-end headphones worth $300, per a request from EVANS.

University-3.

        b.    EVANS thereafter called Player-4 and told him to
come to EVANS's hotel room.  While they waited, EVANS turned to
the subject of Player-3 (who played basketball for University-2,
EVANS's former employer), and indicated that he intended to get
CW-1 "in front" of Player-3, adding that he remained close with
Player-3 and his family.

        c.    Player-4 then arrived at the hotel room and EVANS
introduced him to CW-1.  Referring to CW-1, EVANS told Player-4
"this is the man I was telling you about."  EVANS added, "I just
told [Player-4] this:. . . [CW-1's] a business guy, and it's not
just about basketball.  It's networking through basketball.'  You
know what I mean?"  EVANS further told Player-4, "[t]his year, if
you want to come out" – meaning, join the NBA draft – "you going
to have the backing to come out if necessary.  But if you don't,
I'm going to make sure you're – you go to Arizona, go to Miami
for training.  You don't have to worry about things like that.
And from a financial point. . . I'm going to put you in place
with [CW-1] through me and our relationship, so he can help you
do what he's – this is not a basketball agent.  You know what I
mean?"  EVANS told Player-4 that he could sign with "the best
agent," but "who cares. . . . From a financial point, [agents]
don't like to do that.  They hire other people."

        d.    EVANS vouched further for CW-1, telling Player-4
that "I'm so comfortable [with CW-1] that we hang out together.
We coordinate meeting in Miami, meet in Arizona, meeting in
California. . . . . He just opened a restaurant in Pittsburgh.  I
just haven't been up there yet, you know what I mean."[12]

        e.    EVANS told Player-4 that EVANS was introducing
CW-1 to other top-caliber college athletes, explaining that "you
know, it's not just you. Like I told you coming in – he's going
to help [Player-3] and his family at [University-2].  He's going
to help probably [another player], and you know, guys that I
been involved with who I want to help.  I'm not just helping
everybody."  According to EVANS, "I don't have a lot of people
come around me. . . . But this is my guy," and further explained

_____

[12] Based on my discussions with CW-1, I have learned that CW-1, in
fact, had not opened a restaurant in Pittsburgh.

that CW-1 was "going to help me.  Personally, has helped me
personally.  And I trust that."  EVANS added, "like I said, I
want you to meet [CW-1]. . . . It's going to benefit you.  I
promise you that.  It's going to benefit you.  You just stay the
course, play the game, and you'll be fine."

      f.    After Player-4 left the hotel room, CW-1 provided
EVANS with the $2,000 bribe payment, which CW-1 described as
"two for February."

    66.   On or about April 5, 2017, LAMONT EVANS, the
defendant, and CW-1 spoke by telephone.  The conversation was
recorded by CW-1.  During the call, EVANS informed CW-1 that
Player-4 "is going to come back to school.  He's not going into
the draft.  That's what he says.  He got advice from the NBA to
come back for the year."  As a result of Player-4's decision,
Player-4 will be eligible for the NBA draft in 2018.

### F.   EVANS Arranges For SOOD to Meet with Player-3's Mother; SOOD and UC-1 Discuss Setting Up a Bribery Fund

    67.   Starting in or around April and May 2017, after
pressuring Player-4 to retain CW-1's services, LAMONT EVANS, the
defendant, arranged to introduce MUNISH SOOD, the defendant, to
Player-3's mother.[13]  In addition, SOOD and CW-1 discussed
whether EVANS would solicit more money from them.  On a May 17,
2017 telephone call between SOOD and CW-1 that was recorded by
CW-1, SOOD confirmed with CW-1 that CW-1 had "already given
[EVANS] money but he hasn't delivered anything to you yet,
right?," and CW-1 responded "No, because . . . what we talked
about is, we'll really be getting things in order for the '18
draft."

    68.   On or about May 24, 2017, CW-1 met with MUNISH SOOD,
the defendant, at SOOD's office in New Jersey, after which they

---

[13] As noted above, EVANS previously had coached Player-3 at
University-2, and had identified Player-3 as a potential client
for SOOD and CW-1 while EVANS was still employed by University-
2.

drove to a nearby restaurant for lunch.[14] CW-1 was accompanied by UC-1, who was posing as a business partner and financial backer for CW-1. During the meeting, which CW-1 and UC-1 recorded on audio and video, SOOD, CW-1 and UC-1 discussed setting aside approximately $100,000 to fund bribes to college coaches, including to LAMONT EVANS, the defendant. The group also discussed making continued payments to EVANS of $2,000 per month in exchange for EVANS directing certain players to SOOD, CHRISTIAN DAWKINS, the defendant, and CW-1. SOOD expressed concern about the logistics of making such payments "because you know I'm regulated, right?" SOOD later told CW-1 that he was prepared to pay EVANS $1,000 per month, but wanted to funnel the payments through CW-1 or UC-1.

69. I know from discussions with CW-1 that, in or around June 2017, MUNISH SOOD, the defendant, informed CW-1 that he had met with Player-3's mother in South Carolina, as had been arranged by LAMONT EVANS, the defendant.

70. On or about August 10, 2017, MUNISH SOOD, the defendant, and CHRISTIAN DAWKINS, the defendant, spoke by telephone. During the call, which was intercepted in connection with a judicially authorized wiretap on a cellphone used by DAWKINS (the "Dawkins Wiretap"), SOOD and DAWKINS discussed LAMONT EVANS, the defendant, and noted that bribing EVANS was risky. Specifically, on the call, SOOD and DAWKINS discussed the following, among other things:

a. SOOD told DAWKINS that EVANS "scares me" and relayed that a sports agent ("Sports Agent-2")[15] had told SOOD that he had paid EVANS "like twelve or thirteen grand" over the previous year, and that Sports Agent-2 had found out that other athlete advisors also had been paying EVANS. DAWKINS noted, "that's what I'm saying, he's like all over the place bro." SOOD told DAWKINS that EVANS had called SOOD and asked for additional money, but that SOOD had told him that UC-1 was already "taking

---

[14] The May 24, 2017 meeting is discussed in further depth below. *See infra* Paragraph 83.

[15] A related Complaint, *United States* v. *Chuck Connors Person, et al.*, 17 Mag. ____, references a "Sports Agent-1" who is a different person.

care" of EVANS.

b.    SOOD added that EVANS had texted him when he was in Miami and asked if SOOD had a "package" for him, and SOOD replied "'I don't have anything for you.' I said 'you've already been given.' Never heard back from him. . . . I don't know man, he scares me." DAWKINS replied, "me too man." SOOD cautioned, "I think if you get that kid from [University-3]," which I believe based on my participation in this investigation was a reference to Player-4, then "fine, but . . . I think you limit your interaction with him."

## V.   ALLEGATIONS INVOLVING EMANUEL RICHARDSON

71.   As set forth in more detail below, beginning in or around February 2017, and continuing through September 2017, UC-1, working with CHRISTIAN DAWKINS and MUNISH SOOD, the defendants, paid and/or facilitated the payment of $20,000 in bribes to EMANUEL RICHARDSON, a/k/a Book," the defendant, some of which RICHARDSON appears to have kept for himself and some of which he appears to have provided to at least one prospective high school basketball player ("Player-5") in order to recruit Player-5 to play for University-4. In exchange for the bribe payments, RICHARDSON agreed to use his influence over the student-athletes he coached to pressure them to retain DAWKINS and SOOD as a manager and financial advisor, respectively.

### A.   *RICHARDSON and SOOD Are Introduced by DAWKINS, and Meet in Las Vegas, Nevada*

72.   Beginning in or around February 2017, MUNISH SOOD, the defendant, raised with CW-1 the prospect of paying coaches at University-4. Specifically, on or about February 27, 2017, SOOD and CW-1 spoke by telephone on a call that was recorded by CW-1. On the call, SOOD told CW-1 that SOOD was going to Las Vegas in March for a college basketball tournament in which University-4 was playing. SOOD told CW-1 that he was going to watch a top basketball player for University-4 and would be having dinner with a coach at University-4, who was subsequently identified as EMANUEL RICHARDSON, a/k/a "Book," the defendant. SOOD further stated that while he did not know what the coach "want[ed]," SOOD would "rather meet him face to face and get that clarity" regarding the coach's "angle." In another recorded

call a few days later, on March 2, 2017, SOOD indicated to CW-1
that he had been introduced to the University-4 coach, *i.e.*,
RICHARDSON, by CHRISTIAN DAWKINS, the defendant.

73.    On March 3, 2017, MUNISH SOOD, the defendant, again
spoke by telephone with CW-1 regarding his forthcoming trip to
Las Vegas.  During the call, which CW-1 recorded, SOOD told CW-1
that he would be meeting with two coaches from University-4 on
March 8, 2017 for dinner at a particular restaurant in Las
Vegas.  SOOD added that one of the University-4 coaches was
recruiting a "top pick for next year's class, so he's bringing
that kid's uncle, so like I can, we can get in now for next
year's kids."

74.    On the evening of March 8, 2017, the FBI conducted
surveillance in the vicinity of the restaurant where MUNISH
SOOD, the defendant, had told CW-1 he would be meeting with the
two coaches from University-4.  Based on my discussions with
those agents, I know that they saw SOOD and his female assistant
("Assistant-1") congregating in the bar area of the restaurant,
during which time they interacted with a group of individuals,
including two unidentified males and one unidentified female.
SOOD and Assistant-1 subsequently sat down at a table in the
restaurant to eat.  Towards the end of their meal, two of the
unidentified males described above sat at a table adjacent to
SOOD and Assistant-1 and talked with them for approximately five
minutes.  SOOD and Assistant-1 then left the restaurant.

75.    Based on my review of call records for a cellphone
used by MUNISH SOOD, the defendant, I know that the next day, on
or about March 9, 2017, SOOD exchanged three telephone calls
with a cellphone subscribed to by EMANUEL RICHARDSON, a/k/a
"Book," the defendant.  In addition, SOOD's call records for
March 9 also show that SOOD exchanged two telephone calls with a
cellphone number that I know is subscribed to by another
individual who was then an assistant coach for the men's
basketball team at University-4.

76.    On or about March 14, 2017, MUNISH SOOD, the
defendant, spoke to CW-1 on a telephone call recorded by CW-1.
On the call, SOOD relayed to CW-1 the substance of his meeting
with the coaches from University-4 in Las Vegas.  In particular,
SOOD told CW-1 that the meeting had been "good" and that "the
coaches are interested in definitely working with us" but that

they wanted to wait to finish that year's NCAA tournament before engaging with SOOD and CW-1.  SOOD added that the coaches had a "pipeline of kids, eventually these guys will be head coaches, I mean, so, so it's all good."  SOOD informed CW-1 that, "as of right now, [the University-4 coaches] haven't asked for anything, but I'm sure when the time comes they will, right?"  Later in the conversation, SOOD told CW-1 that one of the University-4 coaches had invited SOOD to the university's campus, which SOOD noted "will be great bonding."  In response to a question from CW-1 about what SOOD thought the coaches eventually would need from them, SOOD replied that "my gut feeling is . . . their needs are going to be for the next year's kids. . . they've already got a bunch of kids lined up."

77.  On April 24, 2017, MUNISH SOOD, the defendant, called EMANUEL RICHARDSON, a/k/a "Book," the defendant, and their telephone call was intercepted over a judicially authorized wiretap on a cellphone used by SOOD (the "Sood Wiretap").  During the call, SOOD encouraged RICHARDSON to visit him next time he was in the New York City area.  SOOD then told RICHARDSON that he worked with CHRISTIAN DAWKINS, the defendant, and that he and DAWKINS were "happy to be supportive in any way we can," noting that RICHARDSON had "a lot of talent in the league," and that "as you get more comfortable with me and my team, my hope is that we can continue to, you know, build a long-term relationship."  RICHARDSON responded that he "prided" himself "on being a people's guy . . . a relationship guy.  Because I just think, in terms of what we do, everyone's just looking for a good person."  SOOD reiterated that he just wanted to be "supportive" to RICHARDSON, and that SOOD's "goal is to always take care of my clients."  SOOD further stated, referring to the players, "and we tend to become friends, right?  We're travelling with them.  We're hanging out with them.  And we're helping them" because "everyone offers the same crap to be honest anyway.  It's just the relationship."  RICHARDSON responded, "I'm with you. I'm definitely with you."

**B.  *DAWKINS Is Fired by SMC-1 And Forms His Own Company With SOOD and UC-1; DAWKINS and SOOD's New Company Begins To Pay Bribes to Coaches, Including RICHARDSON***

78.  As noted above, through May 2017, CHRISTIAN DAWKINS, the defendant, was employed by SMC-1, a sports agency that specialized in the representation of professional athletes.

38

However, I am aware, based on my review of publicly available information as well as calls intercepted during the investigation, that on or about May 4, 2017, DAWKINS was terminated by SMC-1 as a result of a memorandum published by the NBA Players' Association ("NBAPA") that detailed DAWKINS's purported use of an NBA basketball player's credit card to pay for unauthorized car service rides.

79.   As previously noted, in or about May 2017, the FBI introduced UC-1 to MUNISH SOOD and CHRISTIAN DAWKINS, the defendants, through CW-1 who, as detailed above, already was known to both SOOD and DAWKINS in connection with their efforts to bribe LAMONT EVANS, the defendant. At the direction of law enforcement, CW-1 introduced UC-1 to the scheme participants as CW-1's financial backer – *i.e.*, the individual who had been providing the money with which CW-1 was bribing assistant coaches – and as somebody interested in helping to provide funding for DAWKINS should he pursue his own athlete management business.

80.   On or about May 2, 2017, MUNISH SOOD and CHRISTIAN DAWKINS, the defendants, spoke by telephone on a call that was intercepted over the Sood Wiretap. On the call, DAWKINS and SOOD discussed the NBAPA investigation, telling SOOD that the charges to the player's credit card were "above board," and that his clients would remain with him. DAWKINS told SOOD that he was considering opening his own "management company" so that he could "get a bigger percentage of the contract on my end." DAWKINS explained that the new company would be a "spinoff management company" and would "do all the marketing and management for the players." DAWKINS proceeded to discuss specific players that would remain his clients despite his termination from SMC-1. SOOD told DAWKINS that this was a "good opportunity" for DAWKINS to start his own management company and asked how much DAWKINS would need to fund the company. DAWKINS responded that he needed "a hundred grand for my living stuff" and additional money for travel expenses, and SOOD responded that "we can help you fund it."

81.   On or about May 11, 2017, MUNISH SOOD, the defendant, met with CW-1 at a bar in Miami, Florida. CW-1 brought UC-1 to the bar to introduce UC-1 to SOOD for the first time. During the meeting, which was recorded by CW-1 and UC-1 on audio and video, SOOD, CW-1, and UC-1 discussed entering into a sports management

business together that would include paying coaches in order to obtain athlete clients.  Specifically:

          a.    SOOD explained to UC-1 that CW-1 showed him that the "best way" to recruit clients "is to get the coaches."  SOOD referenced EMANUEL RICHARDSON, a/k/a "Book," the defendant, at University-4 and said that he was going to meet with RICHARDSON and ask, "what do you want?"

          b.    SOOD also discussed CHRISTIAN DAWKINS, the defendant, and told CW-1 and UC-1 that he had given money to DAWKINS to help him set up his own management company.  SOOD said that DAWKINS had connections to coaches, including to LAMONT EVANS, the defendant, and RICHARDSON.  SOOD explained to UC-1 that DAWKINS had run into problems with the NBAPA for the alleged improper use of athlete funds, and SOOD proposed leveraging DAWKINS's relationship with athletes and coaches either by finding DAWKINS a new sports agent to work with, or by having SOOD, CW-1, and UC-1 serve as the "front" of DAWKINS's new company.

      82.    Shortly after the meeting described above, on or about May 15, 2017, MUNISH SOOD, the defendant, contacted CW-1 to arrange a meeting between SOOD, CW-1, UC-1 and CHRISTIAN DAWKINS, the defendant, for the purpose of further discussing DAWKINS's new management company.  That meeting, which CW-1 ultimately did not attend, occurred on May 16, 2017 at a hotel in New York, New York, and was recorded on audio and video by UC-1.  At the meeting, DAWKINS, SOOD and UC-1 discussed DAWKINS's business plan, including the benefit of making bribe payments to coaches.  Specifically, during the meeting:

          a.    The group discussed DAWKINS's ability to leverage his relationship with athletes, their parents, and college coaches.  As to the coaches, DAWKINS said that some coaches direct their players to one specific agent and stated that he was "sure they're getting something in return for that."  By way of example, DAWKINS pointed to LAMONT EVANS, the defendant, as a coach who was taking bribes in return for steering players to retain certain advisors.  DAWKINS said that EVANS "got that money because of me," and boasted that he also had helped EVANS get his current job as an assistant coach at University-3.

b.   In response to a question from UC-1 regarding how they could "guarantee" that a student-athlete would sign with a particular advisor while the athlete was still at college, DAWKINS explained that "if we take care of everybody and everything is done, we control everything . . . you can make millions off of one kid . . . Now some schools, we won't have access to the coaches, and that just means that I have to be down there more.  You have the coaches, it saves us money in expenses."  DAWKINS further acknowledged that having influence over the coaches could "protect the investment."

83.   On or about May 24, 2017, MUNISH SOOD, the defendant, met with CW-1 and UC-1 at SOOD's office in New Jersey, after which they drove to a nearby restaurant in order to discuss investing in the new business being started by CHRISTIAN DAWKINS, the defendant.[16]  CW-1 and UC-1 recorded the meeting on audio and video.  During the meeting, the following occurred, among other things:

a.   SOOD, UC-1, and CW-1 discussed the investment in DAWKINS's business, and SOOD informed them that DAWKINS wanted $250,000 in funding for the first year, half of which would be used for DAWKINS's salary and half of which he would use for travel, entertainment, and other expenses.  SOOD, UC-1 and CW-1 then discussed creating a separate fund to cover the payment of bribes to coaches, including, as detailed below, LAMONT EVANS and EMANUEL RICHARDSON, a/k/a "Book," the defendants.  SOOD noted that they "should . . . be prepared to have $100,000, maybe, for a couple of coaches and stuff . . ."  Later in the same meeting, UC-1 said that money for coaches should be in a "separate pot" that DAWKINS "will never control, but that he can have access to through us for expanding his coaching tree, so to speak."  SOOD replied that such a setup "adds tremendous value" and that DAWKINS "should be setting up meetings with assistant coaches."  SOOD added that "you don't want too many guys like us knowing what's going on."  SOOD noted that DAWKINS had introduced him to EVANS, as well as coaches at University-4 and other universities.

---

[16] The May 24, 2017 meeting was referenced previously in paragraph 68, *supra*, in connection with the allegations against LAMONT EVANS, the defendant.

b.   As noted above, at the meeting, SOOD and CW-1 also discussed future payments to EVANS. CW-1 told SOOD that EVANS had requested $2,000 per month to continue the relationship, whereby EVANS would direct certain players to be represented by SOOD and DAWKINS. After SOOD asked how such a payment would occur, CW-1 told SOOD that EVANS would "tell you how," to which SOOD replied, "Because you know I'm regulated, right?" SOOD later told CW-1 that he was prepared to pay EVANS $1,000 per month, but wanted to make the payments through CW-1 or UC-1.

c.   While driving to the restaurant from SOOD's office, SOOD received a call from DAWKINS, which SOOD placed on speakerphone so that UC-1 and CW-1 could participate in the call. SOOD asked DAWKINS about his relationships with coaches, and DAWKINS replied, "I mean, if I screenshotted you right now, Munish, my call log from today as far as coaches..." DAWKINS listed a number of coaches that he had talked to "today alone," including RICHARDSON. DAWKINS added, "I can go to [University-4's] practices like I'm on the team . . . The coaches, that's the easy, that's the easiest thing because they all, I know them all anyway. We're friends." DAWKINS added that "I think the biggest role you guys can have is . . . if you're dealing with the coaches that I deal with, far as helping them out . . . If you guys could kind of help come in and manage those situations, those relationships a little bit more early, early on I think it could help everything run smoothly, get everything off the ground."

84.   Following the May 24 meeting, MUNISH SOOD, the defendant, and UC-1 engaged in several telephone conversations regarding the parameters of going into business with CHRISTIAN DAWKINS, the defendant, which were recorded by UC-1. On those calls, SOOD and UC-1 agreed to provide DAWKINS with $200,000 in funding on an annual basis, to be paid quarterly, in exchange for receiving an equity share of DAWKINS's new company. With respect to the quarterly $50,000 payments, UC-1 agreed to contribute $40,000, and SOOD agreed to pay $10,000.

85.   On or about May 31, 2017, MUNISH SOOD, the defendant, spoke by telephone with CHRISTIAN DAWKINS, the defendant, on a call that was intercepted over the Sood Wiretap. During the call, SOOD and DAWKINS discussed potential dates for DAWKINS to meet with SOOD and UC-1 to "get [DAWKINS] funded" and to sign a

contract governing SOOD and UC-1's investment in DAWKINS's new company. SOOD then turned the conversation to identifying which coaches DAWKINS could help SOOD and UC-1 make bribe payments to in order to secure business for the company. Specifically, the following conversation, in substance and in part, occurred:

      a.   SOOD asked DAWKINS to "send us a list of the coaches, you know, that's important to us. Your top 10 or 15 coaches that, you know, we could be working with going forward." DAWKINS asked if SOOD meant assistant coaches, and SOOD responded in the affirmative. DAWKINS said that he would "go through programs I deal with the closest and put down what coaches I deal with the most."

      b.   After SOOD referenced the payments that he, CW-1 and UC-1 had made to LAMONT EVANS, the defendant, DAWKINS responded that EVANS was "not even on the same stratosphere as some of the other guys. . . . you're talking about helping guys out, I mean, [University-3] is not going to get the same level of players" as universities such as University-4. SOOD confirmed that he wanted DAWKINS to tell them "where we want to use our money," and DAWKINS agreed to provide him with a list of universities and coaches. SOOD responded, "Like Book [EMANUEL RICHARDSON, the defendant] in [Univesity-4]. . . we know if we help him, he's gonna take care of us." DAWKINS responded "No question, okay."

      86.   On or about June 1, 2017, MUNISH SOOD, the defendant, sent a series of text messages to UC-1, copies of which I have reviewed. The text messages contained copies of either an e-mail or text message sent by CHRISTIAN DAWKINS, the defendant, to SOOD, which SOOD forwarded to UC-1. The messages from DAWKINS to SOOD read "These are my main guys," and then listed a number of basketball coaches at NCAA Division I universities, including EMANUEL RICHARDSON, a/k/a "Book," and ANTHONY BLAND, a/k/a "Tony," the defendants.

      87.   On or about June 6, 2017, CHRISTIAN DAWKINS and MUNISH SOOD, the defendants, along with Assistant-1, met with CW-1 and UC-1, as well as two additional undercover FBI agents posing as associates of UC-1 (including UC-2) on a boat docked off Manhattan, New York. The purpose of the meeting was for SOOD, DAWKINS and UC-1 to sign a shareholder agreement that had been drafted by SOOD, which set forth the terms of the financing and

ownership of DAWKINS's new management company (the "Shareholder Agreement"),[17] and to provide DAWKINS with an initial payment to fund the new company. CW-1 and UC-1 recorded the meeting, including by video, at the direction of the FBI. During the meeting, the following, in substance and in part, occurred:

      a.  UC-1 told DAWKINS that he had received the list of coaches DAWKINS had previously provided to SOOD, and asked DAWKINS to tell him which coaches on the list would "buy into our business model." DAWKINS asked UC-1 what he "envision[ed] . . . specifically with the coaches?," and UC-1 responded that "the more coaches that are on board at the assistant level . . . especially if we're funneling players to schools [where] we know the coach is kind of on board with our model," that the players "know that we have a coach that we're dealing with, it just strengthens the relationship" and that "the bigger our coaching tree is," "the more successful we'll be down the road."

      b.  SOOD added "when we have the assistant coaches . . . let's just make sure they know, if they need something, they're funded." DAWKINS asked SOOD and CW-1 how much they were willing to pay the coaches, to which CW-1 responded "Lamont-esque," referring to the amount in bribes that they had paid to LAMONT EVANS, the defendant. DAWKINS asked how much they were paying EVANS, and CW-1 responded that he and UC-1 were providing EVANS with $3,000 per month, and SOOD was providing EVANS with and additional $1,000 per month. DAWKINS noted that "Lamont's good but he's not [one of] the elite, elite dudes." Referencing EMANUEL RICHARDSON, a/k/a "Book," the defendant, and other coaches at "elite" college basketball programs, DAWKINS said that "if you're gonna fund those kind of guys, man, I mean like we'd be running college basketball." DAWKINS added, "it's just like, I don't think like, honestly, and I love Lamont to death, he don't have the resources at [University-3]."

---

[17] During the course of this investigation, I have reviewed a copy of the Shareholder Agreement, which was executed during this meeting by DAWKINS, SOOD, and UC-1, for DAWKINS's new company, to be named "Loyd Inc." According to the Shareholder Agreement, DAWKINS would receive fifty percent of the shares of Loyd Inc., UC-1 would receive thirty-five percent of the shares of Loyd Inc., and SOOD would receive fifteen percent of the shares of Loyd, Inc.

c.    DAWKINS stated that a coach such as RICHARDSON "may need these two kids, and he may need like a grand a month, two grand a month to get something done for this kid. Okay, then you give it to them at that point, because all they should be using the money for is for, to take care of situations for us all to make money in the long run." CW-1 noted that he did not "mind doing a little bit of both, though," meaning giving coaches money both to recruit players and to spend on themselves, to which DAWKINS replied, "if you do a little bit of both, you only give the elite level dudes like a Book [RICHARDSON] four grand a month. Four grand a month is a lot of money to give a coach who doesn't have a first round pick every year." CW-1 then asked DAWKINS to "pinpoint" which coaches they should pay.

d.    DAWKINS stated that if "you going to fund guys that are close to me to help us out, I don't see how we could possibly lose," and proceeded to discuss which coaches on his list he would introduce SOOD, UC-1, and CW-1 to for the purpose of making payments, highlighting in particular RICHARDSON and a few other coaches.

e.    Shortly thereafter, SOOD, DAWKINS, and UC-1 signed the Shareholder Agreement that SOOD had drafted.

f.    During the meeting, UC-1 provided $25,000 in cash to DAWKINS, which represented UC-1's initial investment in the new management company being formed with DAWKINS and SOOD.

## C.    DAWKINS Connects UC-1 to RICHARDSON For the Purpose Of Facilitating Bribes

88.    As detailed in paragraphs 82 through 87 above, in the course of forming their business, CHRISTIAN DAWKINS and MUNISH SOOD, the defendants, discussed the possibility of paying EMANUEL RICHARDSON, a/k/a "Book," the defendant, to use his influence to steer student-athletes at University-4 to their new management company. As noted above, DAWKINS had originally connected SOOD and RICHARDSON in the spring of 2017. In June 2017, after DAWKINS began working more directly with SOOD and UC-1, DAWKINS re-approached RICHARDSON about receiving bribes in exchange for convincing student-athletes on University-4's basketball team to retain the services of the new company formed

45

by DAWKINS, SOOD, and UC-1. Specifically, I have learned that, on or about June 9, 2017, DAWKINS sent a text message to UC-1, a copy of which I have reviewed, indicating that DAWKINS had set up meetings for SOOD and UC-1 with, among others, RICHARDSON on June 20, 2017 in New York, New York.

89. On or about June 20, 2017, CHRISTIAN DAWKINS and EMANUEL RICHARDSON, a/k/a "Book," the defendants, spoke by telephone on a call that was intercepted over the Dawkins Wiretap. During the call, DAWKINS and RICHARDSON discussed the amount of money that RICHARDSON could expect to receive from UC-1 at the meeting scheduled for later that day. Specifically, the following discussion occurred, in substance and in part:

a. DAWKINS told RICHARDSON that he should tell UC-1 that DAWKINS and RICHARDSON were good friends, and that "you need some bread to continue, to build, fucking, what you're doing and, in turn, everybody could win basically." DAWKINS advised RICHARDSON to ask for a specific amount "I think, between you and I, I think it's probably at like five [thousand] a month with you right now in their head. I think you could probably get more." RICHARDSON asked DAWKINS what he could do "to make sure both of us are good," to which DAWKINS responded that RICHARDSON should "do whatever the fuck you want to do with the money." DAWKINS made reference to one basketball player at University-4 who already had received payments "so we got no expenses there," and told RICHARDSON that "you use that money that you get from him to help you recruit, do whatever, or fucking just go on a vacation with it."

b. DAWKINS and RICHARDSON then discussed a high school basketball player, Player-5, that RICHARDSON was paying to recruit to University-4. DAWKINS told RICHARDSON he could "use that shit towards that" — *i.e.*, funnel part of the bribe money to Player-5 — adding "it's multiple ways to skin a cat, you basically tell them how you need your shit structured and I think that they'll come through for you." RICHARDSON then told DAWKINS that Player-5 would be "on campus" that weekend and was likely to commit to play basketball at University-4, "so, you know what I'm saying, like, now, would I be out of bounds to try to get five from him?" DAWKINS replied, "I told them to have some money for you to make you feel good about yourself . . . but if not, the five for [Player-5], is done."

90.   Later that same day, on or about June 20, 2017, MUNISH SOOD, the defendant, Assistant-1, CW-1, UC-1, and UC-2 met with EMANUEL RICHARDSON, a/k/a "Book," the defendant, in a hotel room in New York, New York, as arranged by CHRISTIAN DAWKINS, the defendant.  At the direction of law enforcement, UC-2 attended the meeting as UC-1's business partner.  During the meeting, UC-1 and CW-1 were wearing recording devices.  Two video recorders that had been placed in the hotel room by law enforcement also recorded the meeting.  During the meeting, the following, among other things, occurred:

a. SOOD explained to the group that he had met RICHARDSON through DAWKINS at a basketball tournament in Las Vegas.  SOOD stated that he had "filled [RICHARDSON] in on what this new paradigm is, this new thing we're building collectively and the management," that "part of our model is to focus on working with coaches at the college level," and that "that's what's bringing [us] here together."

b. UC-1 told RICHARDSON that their goal was to "get new kids that we can sign long term" and that they were willing to pay coaches who were willing to direct kids to retain their services because "having a separate funding stream to assist the coaches in the recruitment process to get kids assigned to us" was a good investment and gave them "a little insurance on the players."  RICHARDSON responded that, in the past, he had suggested to certain athletes on University-4's men's basketball team to select any one of a group of agents that RICHARDSON had recommended.  RICHARDSON went on to state, however, that going forward, he simply would tell players to retain DAWKINS and his company, adding "[s]o from this point on I'm steadfast in terms of this is what you're doing and if you're not doing it I need to know what's going on.  Cause when you give them 3 or 4 options, I'm telling you, they look like men but they're kids."

c. At the meeting, RICHARDSON further committed to steer a particular student-athlete ("Player-6") who was on the men's basketball team at University-4 to DAWKINS and his company, stating, "I'm telling you [DAWKINS's] getting [Player-6]. . . there's no ifs, ands about that.  I've already talked with [Player-6's] mom, I've talked with his cousin."

d. RICHARDSON noted that he was "happy" to direct certain players to retain the services of one company,

47

specifically the company controlled by DAWKINS, SOOD and UC-1.   RICHARDSON said that he had "tried to do this a certain way and my model doesn't work.  What it does, is it puts a band aid over a bullet hole.  Because at the end of the day these kids, and they are kids, my job is to try to put them in the best possible situation so everyone can be solid [and] make as much money as possible."  RICHARDSON also suggested that SOOD and UC-1 travel to University-4 to meet certain of the basketball players on the team.

          e.  Finally, at the end of the meeting, UC-1 gave RICHARDSON $5,000 in cash in exchange for his agreement to direct particular basketball players at University-4 to retain the services of DAWKINS's new company when they joined a professional basketball league.

     91.  On or about July 5, 2017, CHRISTIAN DAWKINS, the defendant, spoke with UC-1 in a telephone call that was recorded by UC-1.  Based on my review of the recording, I have learned that DAWKINS asked UC-1 to pay an additional $15,000 bribe to EMANUEL RICHARDSON, a/k/a "Book," the defendant, which RICHARDSON would, according to DAWKINS, provide to Player-5 in order to influence Player-5 to attend University-4. Specifically, on the call:

          a.   DAWKINS told UC-1 that RICHARDSON had a "top point guard in the country" — who, based on my participation in this investigation, I believe is a reference to Player-5 — who was ready to commit to playing basketball for University-4. However, RICHARDSON needed to provide $15,000 to the player "ASAP basically."  DAWKINS said that RICHARDSON was willing to meet UC-1 in Atlanta, the South Carolina area, "or fly to New York and pick it up and take it to the kid's mom."

          b.   UC-1 replied that he would "think about it," and further asked if the $15,000 payment was in lieu of the $5,000 monthly payments to RICHARDSON for the next few months.  DAWKINS responded that he believed RICHARDSON needed $15,000 or $20,000 "to lock this deal in," and then RICHARDSON would not need payments "for a couple months."

     92.  On or about July 7, 2017, CHRISTIAN DAWKINS, the defendant, spoke with EMANUEL RICHARDSON, a/k/a "Book," the defendant, on a telephone call that was intercepted over the

Dawkins Wiretap. On the call, DAWKINS reported to RICHARDSON
that UC-1 was willing to make the $15,000 payment discussed
above if RICHARDSON would agree to treat it as a payment for the
following three months. RICHARDSON replied to DAWKINS that, "Do
that, then let's start something like July, August, September,
or, what, you know, October."

    93.  That same day, on or about July 7, 2017, CHRISTIAN
DAWKINS, the defendant, spoke by telephone to UC-1 in a call
that was recorded by UC-1. Based on my review of the recording,
I have learned that DAWKINS told UC-1 that if UC-1 could provide
EMANUEL RICHARDSON, a/k/a "Book," the defendant, with $15,000,
RICHARDSON would accept that as pre-payment of his $5,000
monthly "fee" for each of the next three months. DAWKINS told
UC-1 that if UC-1 "could get this thing done . . . [the head
coach of University-4] is talking out of his mouth, he wants
[Player-5] bad as fuck. So, I mean, the leverage I have with the
program would be ridiculous at that point." UC-1 inquired as to
whom RICHARDSON would give the money, but DAWKINS replied that
he only knew it was "somebody involved with the kid." DAWKINS
and UC-1 then discussed visiting University-4 to meet with the
student-athletes, but DAWKINS told UC-1 that sometimes it was
best "not to meet these kids because they don't understand the
business or understand the process as much, and sometimes the
kid doesn't fucking know what's going on as much." Instead,
DAWKINS said, the most effective step was to meet "the handler,
the guy who's . . . making the decision." DAWKINS emphasized
that "the kids 90% of the time ain't making they own decisions.
They don't fucking care." UC-1 and DAWKINS then discussed when
and where UC-1 could make the $15,000 payment to RICHARDSON.

    94.  On or about July 20, 2017, EMANUEL RICHARDSON, a/k/a
"Book," the defendant, met with MUNISH SOOD, the defendant, and
UC-1 at SOOD's office in New Jersey so that UC-1 could deliver
the $15,000 payment to RICHARDSON described above. During the
meeting, which was recorded on audio and video by UC-1,
RICHARDSON provided an update on a number of players he was
recruiting, including Player-5. RICHARDSON described Player-5 as
having "committed to us," but explained that Player-5's mother
had asked for money because "she didn't know what I was already
doing for her son." RICHARDSON, SOOD and UC-1 then discussed
RICHARDSON's willingness to steer players to CHRISTIAN DAWKINS,
the defendant, SOOD and UC-1 in return for monthly bribe
payments. "I used to let kids talk to three or four guys, but I

49

was like, why would you do that? You know that's like taking a
kid to a BMW dealer, a Benz dealer, and a Porsche dealer. They
like them all . . . You have to pick for them." RICHARDSON
added, in reference to directing players to DAWKINS, SOOD and
UC-1: "this is done." Later in the conversation, SOOD returned
to the topic, stating: "Like what you said last time, coach . .
. you have to direct them, you can't give them options," noting
that "we need to make sure we're on the same page on that,"
which RICHARDSON confirmed. Toward the end of the meeting, UC-1
provided RICHARDSON with $15,000, stating: "we'll do 15 for
three months, right? And that would let you help with the kids?"
RICHARDSON replied: "It's gonna help with the kids." RICHARDSON,
SOOD and UC-1 also discussed traveling to University-4 to meet
with some of the basketball players in late August or early
September.

95.   Based on my review of publicly available information,
including media accounts, I am aware that on or about August 9,
2017, Player-5 verbally committed to attending University-4.

### D.   UC-2 Meets with RICHARDSON

96.   On or about August 8, 2017, UC-1 called CHRISTIAN
DAWKINS, the defendant. During the call, which UC-1 recorded,
UC-1 informed DAWKINS that UC-1 would be traveling
internationally for the next month but that both CW-1 and UC-2,
who UC-1 had introduced to DAWKINS at a prior meeting as another
business associate, would be available to meet with coaches
and/or players in UC-1's absence, and to continue to fund bribes
to coaches per their discussions.

97.   On or about August 11, 2017, CHRISTIAN DAWKINS, the
defendant, and UC-2 spoke by telephone on a call that was
recorded by UC-2. During the call, DAWKINS discussed the various
coaches DAWKINS and UC-1 had been paying to steer players to
DAWKINS's new company, including EMANUEL RICHARDSON, a/k/a
"Book," the defendant. UC-2 told DAWKINS that UC-2 had already
discussed the prospect of visiting RICHARDSON at University-4
later in August with MUNISH SOOD, the defendant, for the purpose
of having RICHARDSON introduce and steer players to DAWKINS and
SOOD. UC-2 asked DAWKINS if he knew which players RICHARDSON
would introduce to SOOD and UC-2 when they visited, and DAWKINS
responded that while he and RICHARDSON had not yet discussed a
meeting, "I know the guy with the 15 grand we gave him [Player-

5], he committed to [University-4] like three days ago . . . so that deal got done." During the same call, DAWKINS raised LAMONT EVANS, the defendant, telling UC-2, "you guys obviously take care of him directly, you got that worked out."

98.   On or about August 20, 2017, CHRISTIAN DAWKINS and MUNISH SOOD, the defendants, participated in a telephone call with UC-2. Due to an equipment malfunction, the call was not recorded. Based on my debriefings of UC-2, as well as my review of UC-2's contemporaneous written report of the call, I know that during the call, DAWKINS, SOOD and UC-2 discussed, among other things, the details of the planned trip to [University-4] described above. In particular, DAWKINS, SOOD, and UC-2 discussed traveling to meet with EMANUEL RICHARDSON, a/k/a "Book," the defendant, on or about August 30, 2017, for the purpose of having RICHARDSON introduce and steer student-athletes at [University-4] to retain the services of DAWKINS and SOOD.

99.   On or about August 30, 2017, CHRISTIAN DAWKINS, MUNISH SOOD, and EMANUEL RICHARDSON, a/k/a "Book," the defendants, met with UC-2 at a restaurant in Arizona. During the meeting, which was recorded on audio and video by UC-2, the group discussed current student-athletes at University-4 whom RICHARDSON intended to influence to sign with DAWKINS's new company. In particular:

a.   RICHARDSON explained to DAWKINS and SOOD that Player-6, a current player at University-4, was "kind of a sheltered kid," adding that Player-6's relative (the "Handler") would be the decision-maker regarding any of Player-6's athlete advisors. RICHARDSON assured DAWKINS, SOOD and UC-2 that he had already spoken to the Handler on their behalf, adding that the Handler "doesn't know" much about the industry because "this is his first and last rodeo." DAWKINS expressed concern that Player-6 still could be persuaded by other advisors to retain them instead, but RICHARDSON assured DAWKINS that Player-6 was "going to be insulated in who he talks to," adding, with respect to himself, "you're looking at the guy."

b.   SOOD, DAWKINS, RICHARDSON and UC-2 then discussed another current University-4 basketball player ("Player-7"). SOOD summarized "the play for this year" as getting "[Player-5], you feel good about, steering him right?," and adding "how can

51

we get [Player-7]?," to which RICHARDSON responded that he would
"work that." SOOD reminded RICHARDSON that he had promised
DAWKINS and SOOD that he would "no longer giv[e] suggestions" to
his athletes regarding which advisors they should retain, but
instead would direct the players to sign with DAWKINS and SOOD.
RICHARDSON confirmed that was what he planned to do.

100. Later that day, CHRISTIAN DAWKINS, MUNISH SOOD, and
UC-2 met with the Handler, a relative of Player-6 who, as noted
above, was described by EMANUEL RICHARDSON, a/k/a "Book," the
defendant, as the decision-maker for Player-6. During the
meeting, which was recorded by UC-2, the Handler confirmed that
RICHARDSON had attempted to steer Player-6 to retain DAWKINS and
SOOD. Referring to Player-6, the Handler told DAWKINS that "he
knows Book introduced you," adding that was a "hurdle, because
he was like, oh, what is Book tryin' to get out of it."
Notwithstanding that, the Handler made clear that Player-6 was
strongly inclined to sign with DAWKINS and his management
company.

## VI.   ALLEGATIONS INVOLVING ANTHONY BLAND

101. As set forth in more detail herein, beginning in or
around July 2017, and continuing into September 2017, CHRISTIAN
DAWKINS, and MUNISH SOOD, the defendants, working with UC-1,
paid and/or facilitated the payment of at least $13,000 in
bribes to ANTHONY BLAND, a/k/a "Tony," the defendant, in
exchange for BLAND's agreement to exert his official influence
over certain student-athletes that BLAND coached to retain
DAWKINS and SOOD's business management and/or financial advisory
services once those players entered the NBA. In addition, and as
part of the scheme, DAWKINS and SOOD paid and/or facilitated the
payment of an additional $9,000 directly to the families of two
student-athletes at University-5 at BLAND's direction.

### A.   DAWKINS, Merl Code and UC-1 Discuss Meeting Additional
### Coaches, Including BLAND

102. On or about July 5, 2017, CHRISTIAN DAWKINS, the
defendant, suggested to UC-1 that he and UC-1 travel to Las
Vegas, Nevada at the end of that month. DAWKINS told UC-1, among
other things, that the trip would be useful because a number of
college basketball coaches would be in Las Vegas at that time

for the NBA Summer League, which is a series of off-season professional basketball competitions.  DAWKINS told UC-1 that DAWKINS and Merl Code[18] could arrange a series of meetings between DAWKINS, UC-1, and coaches at NCAA Division I universities during the NBA Summer League.  DAWKINS had previously introduced Code — who is affiliated with a sporting apparel company in the area of basketball marketing — to UC-1, and Code had offered to connect UC-1 to college basketball coaches for the purpose of UC-1 making bribe payments to those coaches, in exchange for a fee to Code.

103. At the same time that CHRISTIAN DAWKINS, the defendant, was making this proposal to UC-1, DAWKINS was working with Merl Code to broker meetings between DAWKINS, UC-1, and college basketball coaches at the NBA Summer League in Las Vegas.  For example, on or about July 7, 2017, DAWKINS spoke with Merl Code on a telephone call that was intercepted over the Dawkins Wiretap about setting up such meetings.  During the conversation, DAWKINS asked Code, ""Well, how many ni**as you trying to get him to meet with is the question?"  Code responded, "I mean how many you paying me for?  Cause that's the better question."  DAWKINS then said, "he didn't say" but "you going to introduce him to Tony Bland . . . That's one obviously in Vegas."  As noted above, ANTHONY BLAND, a/k/a "Tony," the defendant, is the associate head coach of University-5 men's basketball team.  After suggesting that Code would connect UC-1 to BLAND, Code went on to list approximately five additional coaches he could introduce to UC-1.  In addition, Code noted that UC-1 "has already met Book," referencing EMANUEL RICHARDSON, a/k/a "Book," the defendant.

### B.    *DAWKINS and Others Meet with BLAND in Las Vegas and Pay Him Bribes*

104. As arranged by CHRISTIAN DAWKINS, the defendant, and Merl Code, on or about July 29, 2017, DAWKINS, UC-1 and CW-1 met with ANTHONY BLAND, a/k/a "Tony," the defendant, at a hotel room in Las Vegas, Nevada.  In advance of the meeting, on or about

---

[18] Code is named as a defendant in a separate, related Complaint filed today.  *See United States* v. *James Gatto, et al.*, 17 Mag. ____.

July 26, 2017, DAWKINS and UC-1 spoke by telephone on a call recorded by UC-1. During the call, DAWKINS told UC-1 that BLAND wanted to be paid $6,000 at the upcoming meeting. At some point between the July 26 call and the meeting on July 29, DAWKINS informed UC-1 that, in fact, BLAND wanted to receive $13,000, and UC-1 therefore attended the meeting with $13,000 in bribe money that had been provided by law enforcement. Prior to the start of the meeting, the FBI placed video recorders in the hotel room; in addition, UC-1 audio recorded the meeting. During the meeting, among other things, the following transpired:

a.    DAWKINS told BLAND, as well as CW-1 and UC-1, that they were "work[ing] together" to make sure that University-5 players retained DAWKINS's company. DAWKINS specifically referenced two current University-5 basketball players: a rising freshman who had recently committed to University-5 ("Player-8"), and a rising sophomore ("Player-9").

b.    BLAND stated that he trusted DAWKINS, and that any University-5 players over whom BLAND had control would be "coming to" DAWKINS. BLAND said that he had "something to do with" all University-5 players and had "heavy influence" over their decisions, including with respect to choosing agents and advisors. At the end of the meeting, in front of BLAND, DAWKINS confirmed with UC-1 that UC-1 had the "thirteen" — meaning the $13,000 in bribe money — and told UC-1 that he would take the money and give it to BLAND. DAWKINS, BLAND and UC-1 then discussed whether future payments to BLAND could be made in person during his periodic trips to New York, and DAWKINS also noted that the group had to "take care of" Player-8 and Player-9. DAWKINS then took the envelope containing $13,000 from UC-1, and left the hotel room with BLAND.

105. As noted above, in or about August 2017, UC-2 began speaking to CHRISTIAN DAWKINS and MUNISH SOOD, the defendants, in UC-1's absence. Following the July 29, 2017 meeting in Las Vegas, and in exchange for the $13,000 in bribe payments, ANTHONY BLAND, a/k/a "Tony," the defendant, assisted in making arrangements for DAWKINS and SOOD, along with UC-2, to meet with family members of Player-8 and Player-9. As reflected in recorded calls, BLAND explained that the purpose of the meetings was to pay those family members, and to discuss DAWKINS's and SOOD's business with those family members. Separately, BLAND

assured DAWKINS and SOOD that he would ensure that both players, and future University-5 players, signed with their company.

### C.   BLAND Steers University-5 Players to DAWKINS and SOOD; DAWKINS, SOOD and Others Meet with University-5 Players' Families At BLAND's Direction and Provide the Families with Payments

106. During the August 11, 2017 telephone call between UC-2 and CHRISTIAN DAWKINS, the defendant, discussed in paragraph 97, in which DAWKINS and UC-2 made plans to travel to University-4 to meet with EMANUEL RICHARDSON, a/k/a "Book," the defendant, DAWKINS further referenced ANTHONY BLAND, a/k/a "Tony," the defendant, and University-5, including the fact that BLAND wanted DAWKINS and UC-2 to make payments to the families of Player-8 and Player-9. DAWKINS suggested that DAWKINS and UC-2 pay the families directly, rather than go through BLAND. In subsequent conversations between DAWKINS and UC-2 in August 2017 that were recorded by UC-2, DAWKINS and UC-2 made plans to travel to California, during the same West Coast trip as their travel to Arizona described above, in order to meet with BLAND and the families of Player-8 and Player-9 in order to pay them, as requested by BLAND.

107. After leaving Arizona on or about August 30, 2017, CHRISTIAN DAWKINS and MUNISH SOOD, the defendants, along with UC-2, flew to California, where they met with relatives of Player-8 and Player-9. In advance of the meeting, UC-2 provided DAWKINS with an envelope containing $4,000, which is the amount of money DAWKINS told UC-2 that ANTHONY BLAND, a/k/a "Tony," the defendant, wanted DAWKINS and UC-2 to provide to Player-8's family. During the meeting, which was recorded by UC-2:

a.   DAWKINS asked SOOD to tell Player-8's relative "a little bit about what you do. Obviously he understands the agent side a little bit, but help him understand the wealth management side." SOOD then described the services he offered to his athlete clients, and told Player-8's relative that "the sooner we work with [the players], sooner we understand their needs, we're better prepared and they're better prepared and their families are better prepared." DAWKINS added that ultimately, they would talk in more detail and put things on paper for Player-8's family, and "sit down and understand it from a business side. When you feel like the kid is mature enough to be

able to have a business conversation, a grown man conversation, to understand who he is and what's about to happen." I am aware, based on publicly available information, that at the time of this conversation, Player-8 was 17 years old. Player-8's relative told the group that Player-8's mother would be "the one kind of managing his day to day," and added that once Player-8 was "mature enough to understand" the "business side" of things, Player-8 could meet with DAWKINS, SOOD and UC-2 as well.

b.    At the end of the meeting, in the relative's presence, DAWKINS asked UC-2 "do you have that," referring to the $4,000, and UC-2 responded in the affirmative. DAWKINS cautioned that it would be "better" to exchange the money outside. The group then left the restaurant. Based on my discussion with UC-2, I know that once outside the restaurant, while walking toward their cars, UC-2 handed DAWKINS the envelope containing $4,000, and DAWKINS then walked off with Player-8's relative.

108. Based on my discussions with UC-2, I have learned that the following morning, August 31, 2017, CHRISTIAN DAWKINS, the defendant, told UC-2 that ANTHONY BLAND, a/k/a "Tony," the defendant, might not be able to meet with DAWKINS, UC-2, and MUNISH SOOD, the defendant, that day because of a scheduling conflict. I am also aware, based on my review of recordings over the Dawkins Wiretap, that DAWKINS and BLAND discussed the meeting with UC-2 that morning, including BLAND's potential inability to attend the meeting due to a conflicting meeting with a member of University-5's compliance staff. During a call that morning between DAWKINS and BLAND that was intercepted over the Dawkins Wiretap, BLAND confirmed that DAWKINS was alone, before asking DAWKINS what UC-2 wanted to meet about. DAWKINS responded by referencing his meetings with and payments of "bread" to the relatives of Player-8 and Player-9, and telling BLAND that UC-2 wanted to ensure that they could "get pros out of the situation" which I believe is a reference to being able to sign up athletes that would join the NBA. BLAND said that he would meet with UC-2 but that he wanted UC-2 to continue to pay the families directly. BLAND told DAWKINS that he did not want to "touch" the payments, adding "I want it all to go through you."

109. Ultimately, ANTHONY BLAND, a/k/a "Tony," the defendant, met with CHRISTIAN DAWKINS and MUNISH SOOD, the

defendants, along with UC-2, on August 31, 2017, at a restaurant on University-5's campus. The meeting was recorded by UC-2, including by video. During the meeting, BLAND told UC-2, SOOD, and DAWKINS that if they continued to fund the families of University-5 players and recruits, BLAND would ensure that those players would retain DAWKINS's and SOOD's services. Specifically, after DAWKINS introduced BLAND to SOOD and UC-2 and the group discussed University-5 generally, the following occurred, in substance and in part:

      a.    DAWKINS asked SOOD to describe his services to BLAND, which SOOD did, adding that it "takes about a year to build [the] relationship" with players, such that DAWKINS, SOOD and UC-2 needed to get started while the players were still playing in the NCAA, including by developing relationships with the "two or three" people responsible for each player's future.

      b.    DAWKINS then turned to the subject of paying University-5 players or their family members, telling BLAND, SOOD and UC-2 that "it's as clean as possible" to pay the families directly, instead of paying them through BLAND, because if BLAND were caught, the scheme would be over and BLAND could no longer help DAWKINS and SOOD. BLAND then added, "my part of the job can be to get the parents, and to introduce them to Christian [DAWKINS] and say hey, I trust him, and vouch for him and even you guys [UC-2 and SOOD]."

      c.    BLAND further detailed his influence over the players, describing two types of players: "some guys, like [Player-8], I can say, this is what you're doing, but other guys, the sooner you get in, you gotta, kind of . . . push them that way and before it's too late, it's what they're doing." BLAND added that, for a majority of the student-athletes that BLAND coached, he would be able to tell them "this is what you're doing." At a later point in the conversation, BLAND stated that "I definitely can get the players. . . . And I can definitely mold the players and put them in the lap of you guys."

      d.    SOOD reinforced to BLAND that he, DAWKINS and UC-2 would be available for anything BLAND needed, including financially, and that "having you [BLAND] at a great program" such as University-5 was significant for SOOD's and DAWKINS's business. BLAND responded that "everything you're saying is

exactly what I'm looking for. And because it comes from
Christian, who I trust, you know because obviously we have a
couple opportunities, where we got us a gold mine over here."
BLAND added that he has had the "opportunity" to get paid by
agents and advisors in the past, and to pay money to players'
families, but that "it's not been this clean from a guy that I
trust."

110. Immediately after meeting with ANTHONY BLAND, a/k/a
"Tony," the defendant, on August 31, 2017, CHRISTIAN DAWKINS and
MUNISH SOOD, the defendants, along with UC-2, met with a
relative of Player-9 at a hotel in Los Angeles, California, as
had been arranged by BLAND in exchange for the cash bribes
previously paid to him.

111. UC-2 was present for a brief portion of the meeting,
after which UC-2 had to leave for the airport. Before the
meeting, UC-2 had provided CHRISTIAN DAWKINS, the defendant,
with an envelope containing $5,000 in cash, which is the amount
of money DAWKINS told UC-2 that ANTHONY BLAND, a/k/a "Tony," the
defendant, wanted to give to Player-9's family. During the
portion of the meeting that UC-2 attended and recorded, DAWKINS
and Player-9's relative discussed "the plan" for Player-9 to
enter the NBA draft this coming year, and Player-9's relative
confirmed that he had spoken with BLAND approximately an hour
before. SOOD then left to take UC-2 to the airport, and DAWKINS
asked SOOD to return to the hotel to discuss SOOD's business
services with Player-9's relative.

WHEREFORE, deponent respectfully requests that warrants be issued for the arrests of LAMONT EVANS, EMANUEL RICHARDSON, a/k/a "Book," ANTHONY BLAND, a/k/a "Tony," CHRISTIAN DAWKINS, and MUNISH SOOD, the defendants, and that they be imprisoned or bailed, as the case may be.

_____
JOHN VOURDERIS
Special Agent
Federal Bureau of Investigation

Sworn to before me this
25th day of September, 2017

_____
THE HONORABLE JAMES L. COTT
UNITED STATES MAGISTRATE JUDGE
SOUTHERN DISTRICT OF NEW YORK