```
 1   UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
 2   ------------------------------x

 3   UNITED STATES OF AMERICA,

 4             v.                            17 CR 684 (ER)

 5   LAMONT EVANS,

 6             Defendant.
                                            Sentence
 7   ------------------------------x

 8                                          New York, N.Y.
                                            June 7, 2019
 9                                          11:30 a.m.

10   Before:

11
                           HON. EDGARDO RAMOS,
12
                                            District Judge
13
                              APPEARANCES
14
     GEOFFREY S. BERMAN
15        United States Attorney for the
          Southern District of New York
16   BY:  ROBERT BOONE
          ELI J. MARK
17        NOAH SOLOWIEJCZYK
          Assistant United States Attorneys
18
     BARNES & THORNBURG, LLP
19        Attorneys for Defendant
     BY:  WILLIAM R. MARTIN
20        ADEYEMI ADENRELE
          -and-
21   JOHNNY L. MCCRAY, JR.

22

23

24

25
```

1          (Case called)

2          MR. BOONE:  Good morning, your Honor, Robert Boone for

3    the government.  Here with me at counsel's table are Eli Mark

4    and Noah Solowiejczyk.

5          THE COURT:  Good morning.

6          MR. MARTIN:  Good morning, your Honor, William Martin

7    on behalf of Mr. Evans.  With me from my firm, Adeyemi

8    Adenrele.  He recently signed a pro hac vice.  Mr. Evans is

9    here present before the Court.

10         MR. McCRAY:  Johnny McCray, Jr., cocounsel for the

11   defendant.

12         THE COURT:  Thank you all.  You can be seated.

13         This matter is on for sentencing and in preparation

14   for today's proceeding I have reviewed the following.  I have

15   reviewed the presentence investigation report, last revised on

16   May 10, 2019, prepared by U.S. Probation Officer Johnny Kim,

17   which includes a recommendation.  I have also reviewed the

18   sentencing letters submitted by Mr. Evans' attorneys filed on

19   May 21, 2019, which includes letters submitted by various of

20   Mr. Evans' family and friends, and I have reviewed the

21   government's submission, dated May 31, 2019.

22         Anything else I should have received or reviewed,

23   Mr. Boone?

24         MR. BOONE:  No, your Honor.

25         THE COURT:  Mr. Martin?

```
 1              MR. MARTIN:  No, your Honor.

 2              THE COURT:  Mr. Martin, have you read the presentence

 3     report and discussed it with your client?

 4              MR. MARTIN:  Yes, your Honor.

 5              THE COURT:  Mr. Evans, have you received a copy of the

 6     presentence report and discussed it with your attorney?

 7              THE DEFENDANT:  Yes, sir.

 8              THE COURT:  Are there any objections to the report

 9     regarding its factual accuracy?

10              MR. MARTIN:  From counsel, no, your Honor.

11              THE DEFENDANT:  No, sir.

12              THE COURT:  Although I am not required to impose a

13     sentence within the guidelines range, I am required to consider

14     the applicable range and, accordingly, I have to do the

15     calculation.

16              Mr. Evans pleaded guilty to Count One of the

17     indictment, which charges him with conspiracy to commit

18     bribery, in violation of 18 U.S.C. Section 371.  That offense

19     carries a base offense level of 12.  To that, two levels are

20     added because the offense involved more than one bribe and an

21     additional four levels are added because a total amount of the

22     bribes was $22,000.  Three levels are deducted from Mr. Evans'

23     acceptance of responsibility yielding a total offense level of

24     15.  Because Mr. Evans has no prior convictions, he's in

25     criminal history category I.
```

1            Is there any objection to that calculation, Mr. Boone?

2            MR. BOONE:  No, your Honor.

3            THE COURT:  Mr. Martin.

4            MR. MARTIN:  No, your Honor.

5            THE COURT:  Based on the parties' representations

6    that, in their view, the calculation that I just described,

7    which is consistent with the calculation in the PSR, is

8    correct, I find that a criminal history category is I and the

9    total offense level is 15, yielding a guidelines range of 18 to

10   24 months.

11           Mr. Boone, did the government wish to be heard before

12   the imposition of sentence?

13           MR. BOONE:  Yes.  Just briefly, your Honor.

14           The government recognizes that your Honor is

15   thoroughly aware of the facts of this case, given that there

16   was a trial and, more recently, there have been two sentencings

17   in this case this week alone.

18           We just want to highlight a couple of things we think

19   make this defendant different than the other defendants in the

20   case, particularly the other coaches that are defendants in

21   this case.

22           One is the length of time this defendant participated

23   in this scheme.  As your Honor is aware, sort of the genesis of

24   defendant's participation began in March 2016, when a meeting

25   was had involving the defendant, government cooperator Munish

1    Sood and Marty Blazer and Christian Dawkins in South Carolina,

2    and you know the purpose of that meeting was sort of begin

3    their relationship and that relationship encapsulating payments

4    being made to Lamont Evans in an effort for him to steer

5    players from South Carolina to Sood and Dawkins and Blazer.

6            And as your Honor will also recall, prior to this

7    arrangement being commenced in March 2016, there is evidence at

8    trial that Mr. Evans actually had been taking money from

9    Christian Dawkins before that date.  We think that is relevant

10   to defendant's sort of background and characteristics to show

11   sort of his culpability and that evidence was recordings

12   specifically regarding the March meeting in which Christian

13   Dawkins said that he had been paying Lamont Evans $2500 at

14   least for a couple of months, even prior to Marty Blazer's

15   involvement.

16           That's important in large part because one of the

17   defenses that's been made in this case is that the government

18   sort of brought this case to be and the government sort of

19   created this whole bribery situation.

20           In particular as it relates to Lamont Evans, this is

21   simply not true.  There is evidence that is frankly undisputed

22   at trial that he had been engaged in similar conduct before the

23   government cooperator came about, before the government

24   cooperator even knew who Lamont Evans was and that he continued

25   that course of conduct once the government did get involved.

1                So in terms of the charged conspiracy that started for

2     Lamont Evans, his participation around March, and it continued

3     for well over a year.  He continued to get paid up until

4     essentially a month or so before the arrests were made in

5     September, if you recall.  He was one of the coaches who went

6     to Las Vegas and received money separate from or sort of

7     different from the other coaches in that Vegas meeting.  Lamont

8     Evans had already been receiving money.  He wasn't a coach who

9     they were meeting for the first time and beginning a

10    relationship with.  Marty Blazer testified that he really just

11    came to Vegas to sort of pick up a check and to reengage

12    conversations with Christian Dawkins because he had already

13    been on the take at that point for over a year.

14                THE COURT:  Remind me, Mr. Boone, that the money that

15    Martin Blazer gave to Mr. Evans, was Martin Blazer cooperating

16    during that entire period?

17                MR. BOONE:  Yes.  Martin Blazer was cooperating during

18    the entire time of the charged conduct.  His cooperation was

19    proactive.  So, yes.  During that time period in July he was

20    proactively cooperating with the government.

21                While we are still on the point in terms of the length

22    of time, another aspect of Lamont Evans' situation that I think

23    differentiates him from the other coaches is that he committed

24    this fraud while working for two different universities.

25                As the Court is aware, it began in South Carolina,

 1   when he was an assistant coach at University of South Carolina,

 2   and then sometime in the spring of 2016, he got a job

 3   opportunity at Oklahoma State University and took that job

 4   opportunity and made it very clear to Marty Blazer that he

 5   wanted to continue their relationship in terms of receiving

 6   bribes.  We have quoted that language in the sentencing

 7   submission.  It's also in the complaint where Mr. Evans makes

 8   clear that his going to a new school will not hinder their

 9   relationship.  In fact, it will make it better because he says

10   there will be better players and there will be more and more

11   business for Blazer.

12            THE COURT:  Let me ask you this.  We have gotten the

13   victim impact statements from the University of Southern

14   California and the University of Arizona.  Is there any reason

15   why we didn't get victim impact statements from the two schools

16   for whom Mr. Evans worked?

17            MR. BOONE:  Your Honor, we notified those

18   universities, like we notified all the universities, and let

19   them know about certainly their right to submit a statement,

20   and we sort of walked through sort of what the statements

21   typically look like.  For reasons not entirely clear to us,

22   they chose not to submit letters.

23            Your Honor, one other aspect we want to highlight that

24   we think makes Evans' conduct different than the others is

25   really the amount of effort he put into the scheme, frankly.

1    There is testimony that Lamont Evans traveled virtually across

2    the country for the primary purpose of getting bribe payments.

3    There is testimony he went to New York.  Obviously, we have

4    talked about Las Vegas already.  There is testimony at trial

5    that he went to Miami.  He also went to Orlando, Florida.

6    There was a meeting that occurred in West Virginia while he was

7    on a basketball trip there.  So it wasn't a situation in which

8    the people who were paying bribes simply were coming to his

9    house and throwing money at him.  He was actually taking

10   efforts to travel to meet those individuals, to accept money.

11          THE COURT:  Do you know whether he was engaging in

12   that travel outside of his responsibilities to the schools for

13   which he was working?

14          MR. BOONE:  For West Virginia he certainly was

15   traveling in relation to an official basketball trip.  They had

16   a game in West Virginia.  For certain of the other trips we

17   don't know for certain if he, on those trips, also did

18   basketball-related events that the government cooperator simply

19   wasn't a part of.

20          But at least in terms of the meetings that our

21   cooperator had with him, they are in hotel rooms, in other

22   places where it was just the government cooperator, other

23   coconspirators, and the defendant.  So at least for those time

24   periods it seemed that he was just there to meet them.  What

25   was he doing other days?  We are not sure, frankly.  But it

1    certainly seemed like at least a good number of those trips

2    were sort of recreational trips, particularly given the timing.

3    Some of those weren't during the school year.

4          Sort of sticking to that sort of point, your Honor, in

5    terms of defendant's efforts he made in the scheme, I want to

6    highlight just one particular phone call that defendant

7    participated in.  This was Government Exhibit 413.  It was an

8    August 4, 2016 phone call.

9          Just to give context, this was a phone call that

10   happened while the defendant was traveling to Florida to meet

11   Marty Blazer and Munish Sood and the context was, he was to

12   meet them to get paid.  Marty Blazer met him and paid him a

13   thousand dollars.

14         There then was another meeting scheduled for the next

15   day with Marty Blazer, Munish Sood, and the defendant.  That

16   meeting happened, but Munish Sood didn't pay Lamont Evans.

17   Lamont Evans was upset about it.  He called Marty Blazer about

18   it.  That call was played at trial.  And during that call he

19   made very clear how important it was for him to pay what he was

20   going to be providing in terms of services in exchange for

21   that.

22         You may recall he mentioned that what he would be

23   doing for Blazer and Sood is he would be burying other agents

24   on behalf of them.  In other words, he would prevent other

25   agents from having contact with players that he was going to be

steering towards them, and he made it very clear that he was going to make it clear to the players that Marty Blazer and Munish Sood were the advisors they were to go with.  He said specifically he is not going to allow them to sort of interview six different individuals and have six different referrals.  He is going to make it clear to them that there is really only one advisor, set of advisors that you are going to go with and it's going to be the people we just discussed.

Another sort of example we want to briefly highlight in terms of the efforts Lamont Evans made in the conspiracy that I think separate him from the other coaches is that he did in fact set up a meeting between a current basketball player who was under his supervision, that's Jeffrey Carroll from Oklahoma University and Marty Blazer.  They met in a hotel room in West Virginia while Oklahoma State was there for a basketball game.  That meeting was recorded.

Mr. Evans made it clear during that meeting that Marty Blazer was going to be your advisor, should you make it to the NBA.  And steering Jeffrey Carroll to Blazer, he made several false statements.  He made a statement -- he sorted touted up his relationship with Blazer as if they were friends when it was very clear the relationship really was just meeting in various cities and Blazer giving him money.

He even suggested that Blazer was helping him out with some financial work, which wasn't true.  He said that Blazer

1    helped him open a restaurant in Pittsburgh.  I think this was

2    an effort to sort of show their familiarity.  Blazer never

3    opened up a restaurant in Pittsburgh.  That was completely

4    false.

5              All of these lies were told to convince the player

6    that Marty Blazer was someone he really did trust and who he

7    did have a relationship with and, therefore, the players trust

8    him as well, when, in reality, this was all just an effort to

9    steer a player to an individual who Lamont Evans knew very

10   little about and, at a minimum, knew was someone who publicly

11   had been accused of stealing money from professional players.

12             Lastly, your Honor, what also separates this defendant

13   from the other coaching defendants is that he took the most

14   amount of money.  As your Honor knows, he took $22,000 in

15   bribes.  That's what was alleged, and we believe that was what

16   was proved up at trial.

17             Just to highlight what I think is interesting about

18   the payments he received that also is unique is that sort of

19   the level of interest in getting as much as possible from the

20   bribe payers.  I think that's best exhibited by the fact that

21   not only was Lamont Evans taking money, but he was even

22   pressuring Marty Blazer to give him things as seemly

23   insignificant at headphones.  You may recall there was

24   testimony about that and that he asked Marty Blazer to give him

25   two headphones.

1          I think even though headphones in and of themselves

2    may seem sort of minimal, I think what it shows is that this

3    defendant really viewed their relationship as a pure monetary

4    one for him to get as much out of as possible on big things and

5    small things in terms of monetary value, and I think that goes

6    to show another level of his culpability in his crime.

7          Unless your Honor has any further questions, we will

8    rest on our submission.

9          THE COURT:  Thank you.

10         Mr. Martin, do you wish to make a statement?

11         MR. MARTIN:  If I may, your Honor.

12         May I speak from the lectern, Judge?

13         THE COURT:  Absolutely.

14         MR. MARTIN:  Good morning, your Honor.

15         Your Honor, this is a difficult time I know for the

16   Court, as well as for any defendant about to be sentenced.  You

17   have heard the evidence in this case, and I am not going to go

18   back over that case.

19         Judge, as I was reflecting on what might be

20   appropriately apparent at this hearing and what might be an

21   appropriate sentence on this, I reflected back to when I was

22   first sworn in as a young AUSA some 40 years ago and there were

23   no sentencing guidelines.

24              (Continued on next page)

25

1          MR. MARTIN:  And we were able to argue to the Court

2     what would be an appropriate sentence based upon the evidence

3     that was adduced at trial or during the plea and the evidence

4     and the facts and the law involved.

5          And I think we're back almost to that point, Judge,

6     after Booker, which allows you to look at the guidelines, not

7     as mandatory but as advisory and determine what would be a fair

8     and just sentence.

9          Your Honor, if we looked at what would be a fair and

10    just sentence in this case, I first would take a moment and

11    just respectfully disagree with my learned counsel in terms of

12    some of the evidence that he's submitted to you.

13         Some of that is his views.  I don't believe there's

14    been any testimony, Your Honor, that we would admit to that

15    Mr. Evans ever received a bribe in Orlando.  We don't know of

16    any bribe in Orlando.  We don't recall, when reviewing any of

17    the evidence, of a bribe in Orlando.

18         He raised Miami.  Mr. Evans went home.  He and his

19    family live in the Miami area.  He wasn't traveling all over

20    the country for purposes of receiving these bribes.

21         Judge, I say that because the government was very good

22    at what they did arranged, would ask him, where are you going

23    to be?  It wasn't like, hey, let's go to Las Vegas for purposes

24    of getting a bribe.

25         The government would find out, where are you going to

be?  They knew there was a big NCAA college recruiting event in

Las Vegas.  All of the coaches were in Las Vegas.  He did not

go there for purposes of soliciting or receiving any bribe

money.

          In New York -- we've listened to every one of those

phone calls.  He was coming to New York and asking, what are

you doing?  I have to go to New York for a recruiting trip.

We'll meet you in New York.

          For the government to stand here and make it look like

he traveled all over the country for the purposes of receiving

these bribes, he wasn't very secretive, but he wasn't

surreptitiously trying to come up with these secret meeting

places.

          They found out where Mr. Evans was going to be, and he

proceeded to travel.  They set up a meeting for him to travel

to New York and then charged it as a Travel Act violation.  He

did not go there with the mens rea, for the purpose, of finding

a spot outside of either South Carolina or Oklahoma to have

this.  He happened to be there.

          Your Honor, I don't mean to downplay the amount at

issue here.  Judge, we're in New York City right now.  For us

to be sitting here talking about the most money, and that most

money was $22,000.

          I don't want the Court to think that I'm making light

of $22,000 because I am not.  But in the grand scheme of fraud

1    schemes that this Court sees and in the grand scheme of fraud

2    in America, $22,000 is not an awful lot of money.

3         Judge, I raise that because I was trying to think of a

4    way that I could stand here before your Honor and try to

5    convince you of how Mr. Evans is really no different from

6    Mr. Richardson or Mr. Bland in what they did in this criminal

7    act.

8         The argument that I put forth to the Court is that

9    there essentially is no difference, Judge.  I expect that

10   Mr. Evans will stand up and say to the Court that what I did

11   violated my oath of trust to both my employer, the

12   universities, and to these kids, as well as to his family.

13        That was the crime, Judge.  What this criminal

14   conspiracy and this agreement was was an agreement for them to

15   violate their trust, all three of them.

16        Now, the fact that Mr. Bland may have received $4,000

17   and Mr. Richardson $20,000 and Mr. Evans $22,000, your Honor

18   should not make that a real different fact.

19        Your Honor, there is no excuse that Mr. Evans can or

20   will make as to why he engaged in this conduct.  It's a crime

21   which is why he pled guilty to that crime.

22        Your Honor, I know that you heard statements during

23   the course of trial, and many of those were statements by

24   Mr. Dawkins, either on the recordings or indirectly hearsay as

25   a coconspirator during the course of one of these conspiracies,

but we would refute a lot of statements made by Mr. Dawkins in those phone calls as to what he says Mr. Evans was doing.

The government alleges that the conspiracy started sometime prior to March 2016.  And we say that because Mr. Dawkins, who they've characterized as a liar, as somebody who is not worthy of belief, and somebody whose credibility is zero because Mr. Dawkins says that prior to that, I was paying Mr. Evans $2,500.

We submit respectfully, your Honor, that's not true. Whether he had ever spoken to Mr. Evans, whether he asked Mr. Evans whether he was willing to do that is something that may have been out there.  But there is no evidence in this hearing, either evidence received in this court or testimony, that Mr. Evans was involved in anything prior to March 16.

Judge, I only say that because I'm trying to find a way to argue to your Honor that these three men, all three of them, have virtually ruined their lives as coaches.  All three of them have violated the trust of their employers, the university, and these kids.

We submit to your Honor -- I know your Honor has said that one may be the least culpable.  The government has agreed that Mr. Bland was the least culpable.

I don't know why Mr. Dawkins would call Mr. Evans. Maybe because they were in South Carolina when it started.  A crime is a crime, your Honor.  We think that there is nothing

J78EA1

1    that really differentiates these three coaches.

2         THE COURT:  I'm sitting here trying to figure out why

3    Mr. Dawkins would lie about -- I understand Mr. Dawkins is

4    responsible for a lot of things, but why he would lie about

5    having paid Mr. Evans unless the deal was that Dawkins would

6    encourage the government's cooperators to pay the coaches and

7    then get the money back as a kickback, but that apparently is

8    not what happened here.

9         Under the circumstances, it seems that it's a

10   statement that I can credit.

11        MR. MARTIN:  Your Honor, since it goes back to prior

12   to the date that this conspiracy alleged, and if you look at

13   404(b) or other extrinsic evidence which your Honor can

14   consider which you clearly can outside the scope of the

15   evidence in this case, we're talking about prior to March of

16   2016, the statements by Mr. Dawkins.

17        Your Honor, one of the reasons that we came up with as

18   to why Mr. Dawkins may have in fact made these statements is

19   because he wanted to show that Evans was on board, that I can

20   get to Evans.  As a matter of fact, he's been on board with me.

21        Mr. Boone even said a couple of months.  He's not

22   talking about something that they could prove for an extended

23   period of time.  I heard Mr. Boone this morning say that at

24   least for a couple of months.

25        So the other alleged conspiracy involving Mr. Dawkins

1    that preceded the conspiracy before your Honor the government

2    submits may have existed a couple of months.  And we're saying,

3    your Honor, that that testimony is not worthy of belief.

4           Judge, if you do believe it, they can't tell you that

5    it raises much more money.  They're trying to find a way to

6    differentiate the conduct of the coaches.  Your Honor, I

7    respectfully submit to you that it really does not.

8           All three men were flawed.  All three men were flawed

9    in terms of the examples of mentorship, the guidance that was

10   expected of them with these young men.

11          Your Honor, if I can go back.  The other thing we

12   think would separate Mr. Lamont Evans from Mr. Richardson and

13   Mr. Bland would be the number of -- not just the sheer number

14   but the content of the letters written by people in the

15   community, written by educators, written by coaches, written by

16   NBA team management of the character of Lamont Evans.

17          Your Honor, I would concede -- one of the things I

18   tell junior lawyers when I'm working with them is you never

19   want to walk into a courtroom and concede much.  But I would

20   concede, your Honor, that what he did is something that

21   cannot -- does not fit with the character of the people that

22   people are describing to you.

23          What he did is an anomaly, your Honor.  This whole

24   thing may have been an opportunity to "get rich quick," and his

25   getting rich quick was $22,000.  Your Honor, what Mr. Evans has

1   lost -- if you were to throw him in jail for any number of

2   years, it will not take away, punishment, that he has caused

3   himself.

4          Mr. Evans was probably in the top tier of assistant

5   coaches ready to move into the ranks of a coach in a Division I

6   basketball program.  He's not there, and he probably will

7   never, ever get back to the NCAA because of this conviction.

8   He's lost that.

9          If you look at what it was that Mr. Evans did put

10  himself in a position to qualify for that, Judge, you see a

11  young man who was clearly skilled as a basketball player from

12  his high school days on.

13         He was all high school in Florida.  He was all college

14  in his first two or three years in playing ball.  When had to

15  transfer from a junior college to a four-year program, he ran

16  out of eligibility, and they revoked his scholarship.

17         And he stopped school and then went back, after

18  playing professionally in Europe, to Kansas State to get his

19  degree and to be trained as an assistant coach.  He has worked

20  very hard to put himself in a position to qualify for that.

21         If you look at what has been lost, the government

22  talked about what had been gained, $22,000.  But Mr. Evans now

23  has lost a job earning $600,000 as a coach.  He's now doing

24  labor because that's the only job he can find in his hometown

25  of the Fort Lauderdale, Florida, area.

1          Your Honor, you've seen the letters from players.

2    Players wrote in on his behalf.  There are three letters in

3    there from players.  There are letters in there from parents of

4    players, even knowing the allegations in this indictment

5    because we made it very clear when we spoke to these people

6    that these are the charges.  This is what he's alleged to have

7    done.

8          Even knowing those charges, parents wanted you to know

9    what Mr. Evans had done on behalf of their sons.  Is he flawed?

10   Did he violate their trust?  Your Honor, he did.

11         I think, most telling, your Honor, we would ask that

12   you consider a non-incarceration sentence.  Mr. Evans is here

13   with his wife and friends who traveled up from Florida to be

14   supportive.  One is a fellow coach in the area.

15         They can talk about the number of young minority kids.

16   And he grew up in a poor neighborhood.  The number of poor

17   kids, minority children, who have been able to go beyond high

18   school because of Lamont Evans, not because of his money but

19   because he saw kids that wouldn't qualify for a DI program that

20   he was able to get into a Division II or a Division III

21   program.  But for Lamont Evans, those kids would not have had

22   that opportunity.

23         Your Honor, incarceration is not -- respectfully we

24   believe incarceration is not something that would change any of

25   the factors that are listed under 3553.

1          When you look at the factors under 3553 and determine

2     a minimally sufficient sentence -- and I'm not going to read

3     them, Judge.  You know the factors under 3553(a)(2) through

4     (d).  We submit that none of those, your Honor, speak to the

5     individual before you.

6          I'm not comparing him to Mr. Bland or Mr. Richardson,

7     although number 5 is the need to avoid unwarranted sentence

8     disparities.  I know that is there.  But if you look at the

9     person that is here, this person is much different than

10    Mr. Bland or Mr. Richardson.

11         We believe, your Honor, that for somebody who has been

12    able to accomplish all that he has accomplished, somebody who

13    has been able to help as many people as he has been able to

14    reach out to, we believe, your Honor, that a sentence, a

15    non-incarceration sentence, would be something that would be

16    appropriate under these facts.

17         Your Honor, if the Court determines that some period

18    of incarceration would be appropriate -- and we respectfully

19    hope that you would not, but if you do, Judge, we would ask you

20    to consider that he have home confinement.

21         Your Honor, I know under the law here in the Second

22    Circuit that I cannot offer and you cannot consider the fact

23    that Mr. Evans is not a U.S. citizen and some of the collateral

24    consequences that may impact him.

25         But a fact of this case is that although Mr. Evans has

1    been in the United States since he was two years old, he

2    unfortunately never became a U.S. citizen.  So there is a high

3    likelihood that there may be removal proceedings for Mr. Evans.

4           We would ask, your Honor, that he be permitted to have

5    as long as possible with his family.  He has a 17/18-year-old

6    son that I know your Honor has read about in the papers as

7    people describe him having an excellent fathering relationship.

8    He's had to look his son in the eyes and tell his son what he

9    did.

10          Your Honor, I think no matter how much incarceration

11   you might impose, there is nothing more painful to the father

12   than looking into his son's eyes and telling him how he failed

13   and how he failed by committing a crime.

14          We think these men are very similar, your Honor.  And

15   we'd ask, respectfully, Judge, that you consider a sentence

16   similar to that of Mr. Bland in sentencing Mr. Evans.

17          THE COURT:  Thank you, Mr. Martin.

18          MR. MARTIN:  Thank you, your Honor.

19          THE COURT:  Mr. Evans, you have an absolute right to

20   address the Court before I impose sentence.

21          Is there anything that you want me to know?

22          THE DEFENDANT:  Yes, sir.

23          Good morning, your Honor.

24          THE COURT:  Good morning.

25          THE DEFENDANT:  Thank you for allowing me to speak to

J73VBAS1

1    you in the court.  Your Honor, I know I'm going to get a little

2    nervous as I'm nervous now.

3            THE COURT:  Take your time.

4            THE DEFENDANT:  So I thank you for allowing me to read

5    this statement to you.

6            Your Honor, I stand before this Court as a humble man.

7    For reasons that I initially could not explain, I risked

8    everything that I worked for for a very long time simply to

9    engage in criminal conduct.  This is what has brought me here

10   today.

11           In hindsight and upon reflection, I knew that it was

12   wrong to use my position of trust to expose my employers, the

13   University of South Carolina and Oklahoma State University, to

14   issues with the NCAA and to disappoint the student athletes who

15   looked up to me.

16           I would like to make it clear that I know what I did

17   was a crime, and that is why I agreed to plead guilty.

18   Your Honor, I accept full responsibility for any actions.  My

19   hope today is that you will not incarcerate me.  I have an

20   18-year-old son who I've had to explain why I put myself and my

21   family in this situation.

22           The simple answer is that I thought it was an easy way

23   to make money.  Over the years, I served as a role model to

24   young women, children, and young adults in my community of all

25   ages.

1    I have worked very hard to educate myself so that I

2    could get a job and support my family.  My wife is here today,

3    and our son is home praying that I will not have to go to

4    prison.

5    I agreed to do things that I knew were wrong, but at

6    the time I did not appreciate how I was hurting student

7    athletes at the universities.  The student athletes placed

8    their trust in me, and I abused that trust in a critical time

9    in their lives, and I also brought a level of scorn upon the

10   University of South Carolina and Oklahoma State University that

11   they did not deserve.

12   I apologize to the universities, the coaches, the

13   athletes, my family, my wife, my son, this Court, and anyone

14   else who I have disappointed or hurt with my bad decision.

15   I only ask that I'm able to start and rebuild my life

16   without first going to prison and continuing a positive path to

17   impact the youth in my community.

18   Your Honor, I am aware of the sentence that you

19   imposed on Mr. Tony Bland and Mr. Book Richardson.  If you do

20   believe it is necessary to confine me, sir, I humbly, I humbly

21   ask that it is a sentence of home confinement.

22   Your Honor, thank you for your time and your

23   consideration in allowing me to speak before you and in front

24   of the Court.  Thank you, sir.

25   THE COURT:  Thank you, Mr. Evans.

1              MR. MARTIN:  Thank you, your Honor.  There is nothing

2     further from the defense.

3              THE COURT:  Very well.

4              In deciding what sentence to impose, in addition to

5     the sentencing guidelines and the commentaries thereto, I've

6     considered all of the factors set forth in Section 3553(a) of

7     Title 18 of the United States Code, including the nature and

8     circumstances of the offense and the history and

9     characteristics of Mr. Evans.

10             I've considered the need for the sentence imposed to

11    reflect the seriousness of the offense, to promote respect for

12    the law, to provide a just punishment to the offense, and to

13    afford adequate deterrence to criminal conduct.

14             I've considered the need to avoid unwarranted sentence

15    disparities among similarly situated defendants.  And having

16    considered these factors, it is my intention to impose a

17    sentence of three months' incarceration to be followed by two

18    years of supervised release, a $100 special assessment, and

19    that Mr. Evans be made to forfeit $22,000.

20             I believe that this sentence is sufficient but not

21    greater than necessary to comply with the purposes of

22    sentencing for the following reasons:

23             This is the third day in a row now that I'm doing

24    this.  And I begin, as I must, by noting that this is, in my

25    mind, a serious offense with real victims, the victims being

 1    the student athletes who Mr. Evans put his interests above

 2    theirs when it ought to have been the other way around and the

 3    universities for whom he worked who have been exposed to not

 4    only the loss of reputation but additional adverse consequences

 5    from Mr. Evans' acts.

 6              To the government's point, I do believe that

 7    Mr. Evans' actions here -- at least the quantum of evidence

 8    that we have concerning Mr. Evans in this case is different and

 9    perhaps more egregious than that of Mr. Richardson and

10    certainly that of Mr. Bland.

11              But it's different and more egregious at the margins.

12    The amount of money, to Mr. Martin's point, is not particularly

13    high.  In fact, it's very low, certainly for the types of cases

14    that we see in these parts.

15              But we do have Mr. Evans on calls requesting

16    additional monies.  We had him discussing particular

17    individuals, particular students.  We have him providing false

18    information to a student in order to ensure that that student

19    comes to trust the government's cooperators.

20              I read very closely the letters that were submitted by

21    Mr. Evans' friends and associates, and I do not doubt the

22    sincerity of any of those letters.  I believe that they

23    understand Mr. Evans -- they know Mr. Evans to be a good person

24    who has been helpful to them and helpful to many others.

25              And I believe sincerely that the individuals that

wrote those letters would not recognize the Lamont Evans that comes across in the government's recordings and video.

This is a case where the government did use substantial cooperating witnesses. However, it would be a mistake to think that this was a government-created offense.

No one's arms were twisted, as far as I could tell, during the course of the recordings and the videos. These bribes were discussed openly, and certainly with respect to the individual coaches that were discussed at trial, no one had to be convinced to take bribes.

I don't know what that tells us about the industry generally, but certainly with respect to the relevant individuals before me, they earned the conviction that they pled to.

So for all of those reasons, I do believe that a sentence of incarceration is necessary. I don't believe that specific deterrence is necessary because I don't believe that Mr. Evans will offend again or that he will come before me again because he has violated one or another of the conditions of his supervised release.

I believe that he will lead a law-abiding life in the future as he has, by and large, led a law-abiding life before these offenses. But in determining the amount of time that is necessary, that is minimally necessary, I also have to consider the fact that this is his first ever offense. It does not

 1   involve violence.  And I have to consider the information that

 2   was provided by Mr. Martin and his co-counsel, the letters that

 3   were submitted.

 4          And I take it on faith that what was relayed to me in

 5   those letters, including by a high school coach and by a

 6   college professor that still remembers with great fondness

 7   Mr. Evans and how helpful he was to her during a difficult time

 8   in her life.

 9          I have to consider that he has in fact helped

10   generations of young men who were committed to his care in

11   various basketball programs, including at the universities at

12   which he worked.

13          And given that, I do believe that a sentence certainly

14   below the guidelines range is appropriate and also certainly

15   below what has already been given to Messrs. Dawkins and Code.

16          So with that, does counsel know of any legal reason

17   why I should not impose the sentence as I've indicated?

18          Mr. Boone?

19          MR. BOONE:  No, your Honor.

20          THE COURT:  Mr. Martin?

21          MR. MARTIN:  No, your Honor.

22          THE COURT:  In that event, that is the judgment of

23   this Court, that Mr. Evans be sentenced to three months of

24   imprisonment on the one count of conviction.

25          The standard conditions of supervised release 1

1   through 12 will apply, as well as the following special and

2   mandatory conditions:

3           The mandatory conditions are:  That you not commit

4   another federal, state, or local crime and that you not

5   unlawfully possess a controlled substance.

6           You must refrain from the unlawful use of a controlled

7   substance and submit to a drug test within 15 days of release

8   and two periodic drug tests thereafter as determined by

9   probation.

10          And the special conditions are that you not incur any

11  new credit charges or open additional lines of credit without

12  the approval of the probation officer and that you must provide

13  the probation officer with any requested financial information

14  and that you obey the immigration laws and comply with the

15  directives of the immigration authorities.

16          I forgot to mention also you must perform 100 hours of

17  community service as directed by the probation officer.

18          You are ordered to pay the mandatory special

19  assessment of $100 which shall be due immediately.  And you are

20  ordered to forfeit $22,000 which I believe you've already

21  agreed to with the government.

22          Are there any open counts with respect to Mr. Evans?

23          MR. BOONE:  Yes, your Honor.  We move to dismiss them

24  at this time.

25          THE COURT:  That application is granted.

1          That constitutes the sentence of the Court.

2          Mr. Evans, I believe I sentenced you below the

3  stipulated guidelines range that was in your agreement with the

4  government.  What that means as a practical matter is that your

5  appellate rights are severely restricted.

6          However, Mr. Martin, will you assure me that you will

7  thoroughly and promptly discuss with Mr. Evans his appellate

8  rights and the effect of the plea agreement on those rights?

9          MR. MARTIN:  I will do so, your Honor.

10          THE COURT:  Mr. Martin, do you have any other

11  applications?

12          MR. MARTIN:  Yes, your Honor.  We ask, your Honor, if

13  you would consider a voluntary surrender in the Miami/Fort

14  Lauderdale area.  Mr. Evans is still assisting his young son in

15  basketball.  If your Honor would consider a date after July 25

16  to allow him to complete this period of basketball with his son

17  for the summer.

18          THE COURT:  July 26.

19          MR. MARTIN:  That would be fine, your Honor.

20          THE COURT:  July 26.  Mr. Martin, if he's not

21  designated by then, you can make an application to have a later

22  date.

23          MR. MARTIN:  That's fine.  Your Honor, we would also

24  ask -- does the judgment and commitment order go in immediately

25  from you?

1          THE COURT:  It will not go in today, but it will go in
2    in the next couple of days.
3          MR. MARTIN:  We would ask you to recommend,
4    your Honor, a facility in the south Florida area, and we will
5    submit an address and name to chambers.
6          THE COURT:  I'm happy to make that recommendation.
7    However, you should know, Mr. Evans, that the Bureau of Prisons
8    is not required to follow my recommendation, but I will
9    certainly make it.
10          THE DEFENDANT:  Thank you, sir.
11          MR. MARTIN:  Your Honor, there is nothing further from
12    the defense.
13          THE COURT:  Mr. Boone, anything further?
14          MR. BOONE:  No, your Honor.
15          THE COURT:  In that event, we are adjourned.
16    Mr. Evans, good luck to you, sir.
17          THE DEFENDANT:  Thank you, your Honor.
18          (Adjourned)
19
20
21
22
23
24
25